Argued October 5, 1976, accused suspended February 3,
petition for rehearing denied March 24, 1977
See 277 Or 731

# In re Complaint as to the Conduct of
# GENE L. BROWN, *Accused.*
## (No. 1149, SC 24368)

559 P2d 884

Donald H. Coulter, Grants Pass, argued the cause
and filed the briefs for accused. With him on the briefs

were Myrick, Coulter, Seagraves & Nealy, Grants Pass.

Ervin B. Hogan, Medford, argued the cause for the Oregon State Bar. With him on the brief were A. E. Piazza, Medford, and Tom Hebert, Portland.

Before Denecke, Chief Justice, and Holman, Tongue, Howell, Bryson, and Sloper, Justices.

PER CURIAM.

## PER CURIAM.

In this disciplinary proceeding the Oregon State Bar (Bar) charged the accused with nine separate violations of unprofessional conduct and a tenth composite charge that if the accused were applying for admission to the Bar his application would be denied.

The Trial Board of the Bar held a four-day hearing and on October 17, 1975, issued an extensive memorandum opinion, findings of fact, and recommendation.

The Trial Board found the accused guilty of a part of each of the fourth, fifth, sixth and eighth charges of unprofessional conduct and not guilty of the remaining charges. The Trial Board recommended discipline in the form of a public reprimand.

The Board of Review, which had recently been organized pursuant to Oregon Laws 1975, ch 641 (ORS 9.535), "elected not to make specific findings." On April 21, 1976, the Review Board concurred in the Trial Board's findings of guilt and also found the accused guilty of "all" charges in the complaint. However, it concurred with "the conclusions reached by the Trial Committee and its recommendation" that the accused "be administered a public reprimand by the Supreme Court of the State of Oregon."

The complaint of the Bar charges that the accused's conduct violated DR5-101, Refusing Employment When the Interests of the Lawyer May Impair His Independent Professional Judgment; DR5-104(A) of the Code of Professional Responsibility of the Oregon State Bar, Limiting Business Relations With a Client; and DR1-102(A)(4), Engaging in Conduct Involving Misrepresentation and in Borrowing Money from Clients.

All of the Bar's allegations of unprofessional conduct against the accused arose out of the business relationship of the accused attorney, Brown, with a client, Carl Jacobson, and with the personal represent-

atives of the estate of Jacobson after his death on October 10, 1968. Prior to 1963 the accused had been the attorney for Jacobson and the two men had been social friends and each had borrowed money from the other. In March, 1963, the accused attorney and Jacobson, an experienced and knowledgeable lumberman and businessman, formed a partnership for the purpose of acquiring, managing, and disposing of cut-off timberlands in Josephine County.

The partnership agreement was not reduced to writing, but the evidence shows that Jacobson was to advance the necessary funds to purchase the land and the accused would furnish required administrative and legal services. Before profits were paid to the partners, Jacobson was to recover the money he advanced plus interest thereon at 10 percent per annum. Thereafter they were equal partners.

Jacobson advanced a total of approximately $33,000 and deed to the land was in the name of accused and Jacobson as grantees.

From the inception, E. T. O'Connor, a certified public accountant who had previously been the accountant and tax adviser to Mr. Jacobson, was chosen as the accountant and tax adviser for the partnership business. He set up the books and necessary records for the partnership and kept possession of them. The accused had the company's check book.

In 1964 the partnership sustained a taxable loss and O'Connor made two adjustments of $1,000 each on the partnership records, showing a transfer of $2,000 to the capital credit of accused. O'Connor made this transfer on his own to preserve the tax benefit and the transfer was recorded on the partnership tax returns and records. The original purpose of the partnership was to buy and sell the property at a profit. However, the land did not sell and by 1966 the partnership harvested timber through gyppo loggers. Because of this operation, the partners agreed to incorporate as Jake Land Co. The accused, Brown, prepared the

[ 124 ]

articles, bylaws, and stock issue. Each partner owned 50 shares of common stock, and the timberland was conveyed to the corporation. The same financial arrangement was continued as agreed in the partnership and neither stockholder was to receive any profit until Jacobson had recovered his original investment. The bylaws provided, in effect, that neither party would sell his stock and the surviving stockholder had a right to acquire the stock at "book value." The evidence indicates that both parties agreed to this arrangement and executed the necessary papers.

On about February 15, 1968, the accused and Jacobson agreed that the $3,000 balance of a $10,000 promissory note given by the accused to Jacobson in September, 1965, would be assumed and paid by Jake Land Co. The effect of this transaction was a gift to the accused by Jacobson of $1,500 to $3,000, depending upon future profit or loss of the corporation, as each party owned one-half of the common stock. The evidence shows that this transaction was related to the accountant, O'Connor, and that O'Connor discussed it with Jacobson, who approved the transaction and authorized O'Connor to show the transaction on the books. O'Connor admitted that through his fault he did not make the required entries on the corporation's books.

The evidence shows that the accused and Jacobson were congenial in their partnership and corporate business relationships and that all financial and accounting information was available from O'Connor.

Mr. Jacobson died October 10, 1968. The accused had drafted his will, naming First National Bank of Oregon (Bank) as executor. The trust office of the bank's Medford Main Branch retained the accused as its attorney to probate the Jacobson will. Brown made a full disclosure to the employees of the Trust Department of the Bank concerning the business relationships of Brown and the deceased Jacobson, including the $3,000 balance on the $10,000 note, which is in evidence.

The widow and son of Mr. Jacobson were not satisfied with the probating of the estate and employed their own attorney, William F. Johnson. Mr. Johnson questioned the corporate affairs and charged conflict of interest on the part of accused. Mr. Johnson was given access to all of the records of the corporation and discussed the matters with O'Connor, the certified public accountant. Following this difficulty, the accused resigned as attorney for the executor (Bank) on December 23, 1970. The Bank retained Carl M. Brophy to serve as its attorney. The Bank desired a complete cash liquidation of the corporation, in which the accused owned 50 percent of the stock, which was declined by the accused for business reasons. The Bank, through its attorney, indicated it would bring litigation against the accused, and the accused employed Mr. Donald H. Coulter as his attorney.

After the Bank secured its own appraisement of the corporation's timberlands, the Bank wrote accused's attorney and offered to sell the Jacobson 50 percent interest in the corporation to the accused. The parties and their counsel negotiated. The Bank wanted $46,000 for its 50 percent share of the stock; the accused offered $36,000. The parties reached the figure of $41,000 as the agreed price for the 50 percent interest in the corporation's stock. Mr. Brophy, on behalf of the Bank, prepared the papers to complete the sale and each party, by the terms of the agreement, released the other for all past events and actions. The accused made the payment to the Bank in full.

During the negotiations and purchase by the accused of the stock, he contacted Mountain Fir Lumber Company to see if it was interested in purchasing a portion of the corporation's land, from which he could raise the money to purchase the stock from the Bank. Through this contact the accused arranged to sell 960 acres from the total 1,500 acres of the cut-over timberland at $100 per acre. The accused did not disclose his arrangement with Mountain Fir to the Bank or its attorney. When the deeds and documents

were recorded in the county records the Bank learned of the accused's transaction with Mountain Fir, and the Bank asserted a claim against the accused and the corporation because of the accused's failure to make the disclosure prior to the time he purchased from the executor. Both parties threatened litigation.

In July, 1971, the accused and the corporation filed a declaratory judgment proceeding against the Bank, as executor, to determine the validity of the 1971 agreement and compromise whereby the accused purchased the estate's 50 percent interest in the corporation. The Bank counterclaimed for compensatory and punitive damages, based on the fiduciary duty of accused as an attorney. The Bank's counterclaim was tried to a jury in July, 1971. During trial the court indicated his thoughts to the respective attorneys and the case was compromised and settled. The transcript of that trial is part of the evidence in this disciplinary proceeding.

Subsequently, as a result of the letter of complaint by the son and one of the heirs of the deceased Mr. Jacobson, this proceeding was instituted on September 6, 1973.

We agree with the Trial Board's memorandum opinion and findings of fact. The numerous charges in the Bar's complaint are founded on a violation of the Oregon Bar's Code of Professional Responsibility, as heretofore enumerated. The Bar's fourth and fifth causes of complaint charged that the accused "failed to require or urge the said Carl Jacobson to receive or procure independent advice" as to: (a) the execution of the corporate bylaws prepared by accused which included a buy and sell agreement limiting the sale of corporate shares first to the corporation and then to the other shareholder (accused), and (b) in entering into an agreement with Jacobson which caused the $3,000 balance of accused's note to Jacobson to be assumed by Jake Land Company, thereby satisfying accused's liability to Jacobson.

DR5-104(A) of the Code of Professional Responsibility provides:

"(A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure."

The evidence shows that at the time the accused entered into the partnership and corporate business with Jacobson it was understood that the accused would furnish all the legal services. From the above facts, it is clear that accused exercised his professional judgment as it affected Jacobson. The very foundation of the arrangement, both as to the partnership and as to the corporation, left the accused and Jacobson with different and conflicting business interests. Jacobson had his money invested and accused risked no capital so he could afford to wait until such time as the land became more valuable. In the meantime, Jacobson received no income on his investment.

As to the buy and sell agreement, there could be several conflicts, one of which was the fact that Jacobson was considerably older than the accused. The accused argues that Jacobson was knowledgeable about corporations and knew what the term "book value" meant and that he examined and approved and signed the bylaws and, therefore, consented to the arrangement.

In earlier disciplinary cases we have cited with approval the following from *In re Kamp,* 40 NJ 588, 194 A2d 236, 240 (1963):

"Full disclosure requires the attorney not only to inform the prospective client of the attorney's relationship to the seller, but also to explain in detail the pitfalls that may arise in the course of the transaction which would make it desirable that the buyer have independent counsel. The full significance of the representation of conflicting interests should be disclosed to the client so that he may make an intelligent decision before giving his consent. * * *"

[ 128 ]

■ An attorney must avoid placing himself in a position where legal advice to his client might have an adverse effect upon his own financial standing, particularly when he has a business relationship with the client.

The same situation is present in the arrangement whereby the corporation (50 percent owned by Jacobson) assumed accused's remaining liability of $3,000 on the $10,000 note to Jacobson. On February 15, 1968, when the transaction took place, accused was attorney for Jacobson and the Jake Land Company.

■ There is no evidence that Jacobson had independent counsel or that accused advised Jacobson or the corporation to secure independent counsel on either the transfer of the note balance or the buy and sell agreement. Accused contends that Jacobson was a knowledgeable, experienced businessman and had the "self-skill" required to protect him in these transactions and that Jacobson would receive the $3,000 along with his capital invested in the corporation before accused realized on his part of the venture. Nevertheless, it is the plain intent of the Bar's disciplinary rules that an attorney will not place himself in this conflicting position. We conclude, as did the Trial Board, that the accused behaved unethically, as charged by the Bar in its fourth and fifth causes of complaint.

The Bar's sixth cause of complaint against the accused arises out of accused's conduct in accepting employment as attorney for the executor of the estate of Jacobson, contrary to DR5-101(A) of the Code of Professional Responsibility, which provides:

"(A) Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests."

The Bar alleges that at the time accused accepted employment as attorney for the Bank, as executor of the estate of Jacobson, he had personal interests

adverse to the estate which reasonably would have affected his professional judgment in the performance of his duties as attorney for the estate as follows:

"(a) The Accused had a possible and potential liability to said estate on account of the balance due from the Accused to the decedent upon the promissory note referred to in the fifth cause of complaint hereinabove alleged.

"(b) The Accused had a potential liability to the estate of the decedent arising out of the issuance to the Accused of 50% of the capital stock of Jake Land Company under the circumstances set forth in the third cause of complaint above alleged.

"(c) The Accused had a potential liability to the estate on account of the transfers from the capital account of the deceased to the capital account of the Accused referred to in the second cause of complaint above alleged.

"(d) The Accused and the personal representative of the estate had a conflict of interest with respect to the validity and effect of the provision contained in the bylaws of Jake Land Company purporting to give to the Accused, as surviving stockholder, an option to purchase the stock of the decedent in said corporation for its book value."

The evidence is in conflict as to the extent of disclosure made by the accused to the Bank as executor. The Trial Board found that the accused did, prior to this employment, "outline his prior business dealings with the deceased, Carl Jacobson, and further that Mr. Brown made available or offered to make available the complete records of Jake Land Co." and further that the Bank, as executor, "should have understood the nature and extent of the potential conflict or conflicts of interest." However, the Trial Board found "full disclosure to a sophisticated client, does not, however, in and of itself, absolve the accused of the charge" as set forth above and that failure of accused to decline appointment as attorney for the executor of the Jacobson estate was improper and unethical.

We have previously quoted the following with approval from Wise, Legal Ethics 77 (2d ed 1970):

" 'The consent of both clients does not of itself accord complete exoneration. Even if obtained after full disclosure, the consent does not relieve the attorney of searching his conscience to discover any latent impropriety not readily perceptible to the consenting laymen.'

"* * * * *.

" '* * * "No man can serve two masters." If there is the slightest doubt as to whether or not the acceptance of professional employment will involve a conflict of interest between two clients or with a former client, or a conflict between the interests of any client and that of the attorney, or may require the use of information obtained through the service of another client, the employment should be refused.' " *In re Boivin,* 271 Or 419, 425, 533 P2d 171 (1975).

■ The evidence shows that the accused made disclosure to two employees of the Bank, executor of the Jacobson estate, one of whom was an attorney. This is not the case of an attorney taking advantage of an unsophisticated and easily influenced individual. However, we agree with the Trial Board that in view of the potential conflict of interest between the accused and the executor concerning the proper interpretation of the buy and sell agreement in the bylaw provision, the accused should have declined employment.

The accused contends that there was no conflict over the bylaw buy and sell provision until after he had terminated his relationship as attorney for the executor. However, the fact that there was a controversy culminating in litigation conclusively demonstrates the potential conflict of interest problem which was presented by the bylaw provision. The accused further contends that, at the most, his acceptance of the employment was negligence and not unethical and that an attorney should not be disciplined for simple negligence. We do not construe the acceptance of employment under the circumstances here present to be one of negligence.

[ 131 ]

In its eighth cause of complaint the Bar charges the accused, while a director of Jake Land Company and attorney for the executor, with having "caused the corporation, Jake Land Company, to pay to the accused the sum of $5,000" on May 15, 1969, and again on February 27, 1970.

In each instance the accused effected the loan by issuing a corporation check payable to his order. The evidence is in conflict as to whether or not the loans were cleared in advance with the executor, but it is clear that the accused did not receive the executor's written consent prior to issuing the checks in his favor, and there is no evidence that any security was provided to the corporation for the advancement of the funds.

At the time of the loans by the corporation to accused, ORS 57.226 provided:

> "No loans shall be made by a corporation to its officers or directors, and no loans shall be made by a corporation secured by its shares."

The Bar contends that the accused converted these funds to his own personal use and benefit. There is evidence that the loans were approved by the corporation's two surviving directors, the accused and O'Connor. The Bank had previously declined to serve as a director in lieu of the deceased Jacobson. Although they were not presented to the Trial Board, there was testimony that notes were executed to cover the two $5,000 loans. The accused testified that he had not been aware of the prohibition provided by ORS 57.226 at the time of the loans.

The Trial Board found:

> "It is difficult to perceive the circumstance in which an attorney acting as counsel for the personal representative of a decedent's estate would determine it prudent to borrow funds in which the estate possessed an interest. * * *.

> "* * * * *.

> "The acts of the Accused in connection with his

corporate loans, if not viewed with all other evidence in regard to his relationship with the corporation and the decedent, would be treated with suspicion. However, it is our opinion that the evidence does not indicate any intention on the part of the Accused to misappropriate the funds which he withdrew from the corporation's account. The Accused throughout his relationship with the decedent, and the corporation, was negligent in not observing good business practices and nowhere was this deficiency greater than in the keeping of adequate records. The informality characterized by the early relationship of Carl Jacobson and the Accused was not separated from their business dealings. Having failed to keep proper records and to adequately inform others of the nature and purposes of his acts, the Accused cannot complain that they may be misconstrued.

"* * * * *.

"* * * Not having been 'fully informed' of the nature and extent of the Accused's 'conflicting interest' or having been advised to seek 'independent advice' the Bank could not have intelligently consented to the loans even if it in fact was aware of them."

The Trial Board found that "the accused's conduct in making to himself personal loans from the corporate account of Jake Land Co. was unethical and in violation of the standards of professional conduct established by the law and by the Oregon State Bar." We agree with the finding of the Bar's Trial Board and we do not believe that under the facts of this case the borrowing of money by the accused constitutes conversion.

These sums of money were borrowed by the accused in 1969 and 1970 respectively. We are aware that litigation between the parties culminating in July, 1971, was settled in 1971. At that time the accused was not acting as attorney for the Bank, the executor of the estate, and the Bank and heirs and devisees of the decedent Mr. Jacobson were represented by competent counsel.

The other allegations in the Bar's complaint which the Trial Board found the accused not guilty of are

[ 133 ]

commingled with and are a part of the charges above discussed. We conclude, as did the Trial Board, that the accused is not guilty of the remaining charges of the Bar's complaint.

■ This court does not condone any actions of the accused as set forth. We recognize that attorneys have historically entered into joint business ventures with clients. However, the facts in this case are a prime example of why the Bar has adopted the above-referred to provisions in its Code of Professional Conduct. Times and circumstances have changed and lawyers should be aware of the dangers that arise both as to the client and attorney when the two are engaged in joint business ventures. Attorneys should be aware of these dangers and adopt proper safeguards for both the attorney and the client. The Bar's Rules of Professional Conduct do not prohibit joint ventures by attorneys with clients, but it is stated that if they have "differing interests" it shall not be condoned "unless the client has consented after full disclosure." DR 5-104(A). The Rule does not state that such "disclosure" be in writing, but prudence dictates that attorneys should reduce the disclosure and understanding with clients to some form of written document. Otherwise, they must bear the consequences.

There is no evidence in this case that the accused acted fraudulently or absconded with any funds. All of the difficulties arose out of some 10 years of dealing between the attorney and the client and the client's estate.

We deem the accumulated unethical acts of the accused warrant more than a public reprimand. We are of the opinion that the accused's unethical conduct requires that he be suspended from the practice of law for a period of 30 days from the entry of the mandate herein.

The Oregon State Bar is awarded judgment against the accused for its costs and disbursements.