Argued and submitted June 5, 1984, accused suspended January 22, 1985

In re Complaint as to the conduct of
# T. LEONARD O'BYRNE,
*Accused.*

(82-64; SC S30028)

694 P2d 955

T. Leonard O'Byrne, Portland, argued the cause and submitted the briefs for Accused, *pro se.*

James C. Rhodes, Portland, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

The Oregon State Bar filed a complaint against T. Leonard O'Byrne accusing him of unethical conduct in three separate causes. All the causes arise or result from O'Byrne's relationship with William and Ann Pfefferle, husband and wife.[1] The Pfefferles were citizens of Canada who wanted to live in the United States. They delivered the sum of $46,000 to O'Byrne to start a business venture to give them "investor status" in order that they might qualify for permanent resident visas. Three years later when the Pfefferles had not received the visas and O'Byrne had not repaid them all their money, a grievance was filed with the Bar. O'Byrne contends that the Pfefferles were not clients but "co-venturers" and the $46,000 was a loan.

The first cause alleges that O'Byrne violated:

"DR 5-101    Refusing Employment When the Interests of the Lawyer May Impair his Independent Professional Judgment.

   "(A)    Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property or personal interests.

The second cause alleges that O'Byrne violated:

"DR 5-104    Limiting Business Relationships with a Client.

   "(A)    A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

The third cause alleges that O'Byrne commingled the Pfefferles' funds with his own funds and used their funds for unauthorized purposes and thereby violated:

"DR 9-102    Preserving Identity of Funds and Property of a Client.

   "(A)    All funds of clients paid to a lawyer or law firm,

---

[1] Pfefferle is pronounced "Peferlee."

including advances for costs and expenses, shall be deposited in one of more identifiable trust accounts maintained in the state in which the law office is situated. No funds belonging to the lawyer or law firm shall be deposited there except as follows: [Exceptions do not apply here.][2]

"* * * * *

"(B)   A lawyer shall:

"* * * * *

"(3)   Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them."

"(4)   Promptly pay or deliver to the client as requested by the client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive."

The chief issues which must be decided in this case are: (1) Did an attorney-client relationship exist between O'Byrne and the Pfefferles? (2) Was the $46,000 delivered by the Pfefferles to O'Byrne a loan or trust funds?

The Trial Board found O'Byrne guilty of all three causes of complaint and recommended that he receive a public reprimand and be required to pass a legal ethics examination. Four members of the Disciplinary Review Board found O'Byrne guilty of all three causes and recommended that he be suspended for a period of three years.[3]

We find O'Byrne guilty of the first and second causes. We find him not guilty of the third cause. We suspend him from the practice of law for a period of four months.

O'Byrne grew up in Saskatoon, Saskatchewan, Canada. He came to the United States in 1958 to attend Gonzaga University in Spokane, Washington. In addition to attending

---

[2] The exceptions to DR 9-102(A) are sufficient funds to pay the account charges and funds belonging in part to the client and in part to the lawyer.

[3] One member of the Disciplinary Review Board disagreed with the sanction and recommended that O'Byrne be disbarred. Two members of the Board did not participate in the review of this matter.

school, O'Byrne played and officiated professional hockey in the Western International League.[4] He graduated from law school and moved to Portland in 1968. After arriving in Portland, O'Byrne continued his association with hockey as an official in a professional league and as the president of an amateur club. Because of this association, he became acquainted with many other Canadians including former professional hockey players Bill Davidson and Con Madigan.

In October 1978, Bill Davidson and his wife introduced William and Ann Pfefferle to O'Byrne. The Pfefferles were Canadian citizens who had a home under construction in Phoenix, Arizona and wanted to move there permanently in the fall of 1979 when their son started college. The Pfefferles had done some investigation toward obtaining permanent resident visas but were confused about the immmigration laws and asked the Davidsons if they knew anyone who could help them. Permanent resident visas are commonly referred to as "green cards." The Davidsons were Canadian citizens who had green cards.

O'Byrne, at the first meeting with the Pfefferles in his law office, told them that they would be required to invest a minimum of $40,000 in the United States to qualify for green cards. He also told the Pfefferles that it might look better if they invested $46,000 instead of the minimum. The Pfefferles' investment in the residence in Phoenix would not help to qualify them for permanent resident visas under the immigration laws. They were aware that O'Byrne had previously entered into business ventures with other Canadians including the Davidsons and the Madigans.

Ann Pfefferle made notes of the first meeting in O'Byrne's office. Those notes in part read: "To qualify—$40,000 U.S. minimum—Len [O'Byrne] suggests $46,000?? Green cards not far away. He [O'Byrne] has contacts. No risk as he [O'Byrne] will pay us interest on our money until we are qualified."

O'Byrne's version of the first meeting with the Pfefferles as to the $46,000 is as follows:

---

[4] The record is not clear but apparently O'Byrne at some point obtained a permanent resident visa.

"We agreed that they [Pfefferles] would put up $46,000 and I would pursue a venture for us. * * * I told the Pfefferles * * * that for me to pursue a business venture would be time-consuming on my part and would take away from other income producing time I would otherwise have in other areas. Therefore, it was clearly intended the $46,000 would be used by me as I needed it while taking the time to get a venture going for us. They were protected by the fact that, if I couldn't get a venture going, I would return their money and pay them maximum interest for the use of it. If the venture was successful, I would provide them with stock or partnership property worth the amount of their investment, and I would assist them with obtaining the necessary immigration documents. * * *"[5]

On October 31, 1978, after the Pfefferles had returned to Canada, they sent O'Byrne checks totaling $20,000. These checks were made payable to "T. Leonard O'Byrne, Attorney at Law."

In November 1978, O'Byrne according to his own statement spent a "great deal of time and effort" investigating business opportunities in Newport, Oregon as a basis for a venture with the Pfefferles. This included advancing $1,000 to an architect to investigate a particular building. He also "went several times to the Immigration and Naturalization Service and obtained information on how the Pfefferles could go about qualifying as an 'investor,' in order to be sure I structured our venture in the proper way." On November 27, 1978, O'Byrne wrote to William Pfefferle acknowledging receipt of the $20,000 and stating that it was "deposited in my attorney-at-law savings account."

In December, 1978, O'Byrne called William Pfefferle in Canada and told him that there might be some difficulty with obtaining the green cards.

On January 11, 1979, O'Byrne wrote to the Pfefferles

---

[5] O'Byrne believed the "business climate" on the Oregon coast in 1978 was excellent for real property development. He had been involved in the development of a 26 unit condominium known as LaQuina Shores and a 12 unit condominium known as Bay Knoll. He also purchased an one-third interest in a motel in Newport. He estimated his net worth in 1980 to be in excess of one million dollars. O'Byrne was interested in entering into a business relationship with the Pfefferles because William Pfefferle was experienced in hotel construction and management and Ann Pfefferle was an "all-around capable business woman." At one time Ann Pfefferle was the office manager and accountant for a six member law firm in Prince George, British Columbia.

that he had been "working with the immigration people on the green cards." He wrote to them again on February 6, 1979, saying that he had conducted "some rather lengthy investigation and research" into the immigration matter and that they should send the additional contribution of $26,000 to "our venture." On March 16, 1979, the Pfefferles forwarded a United States Dollar draft in the amount of $26,000 to "Mr. T. Leonard O'Byrne—Attorney at Law." Ten days later O'Byrne acknowledged receipt of the draft and forwarded to the Pfefferles his promissory note in the amount of $46,000.[6] The letter of transmittal in part reads:

> "This is simply security for you until such time as I have finalized the documents. It is specifically understood that this note will be surrendered to me in return for and upon the issuance of stock in the corporation or other satisfactory documentation to be used for the purposes of qualifying you as an investor under the immigration laws."

On April 19, 1979, O'Byrne wrote to the Pfefferles stating that he had missed a couple of appointments with "his immigration person" because of scheduling difficulties. He expressed a desire to get "our venture" underway because he felt an obligation "to not only handle your immigration matter but also to make you a decent return on your investment." He also indicatd that he had put money into "a couple of things" and then changed his mind, but would not charge the Pfefferles for them.

All of the previously mentioned letters to the Pfefferles were written on "T. Leonard O'Byrne Attorney at Law" stationery.

The record does not disclose any correspondence from O'Byrne to the Pfefferles for over a year between April of 1979 and May of 1980.[7] However, the principals were in touch by telephone and held at least one conference in Portland.[8]

---

[6] The promissory note was payable one year after March 1979, together with interest at the rate of 10 percent per annum from date until paid.

[7] On May 13, 1980, O'Byrne's secretary mailed applications for social security numbers to the Pfefferles at a British Columbia address.

[8] A statement by O'Byrne in the record in part states:

"On Saturday, September 15, 1979, I met with the Pfefferles in Portland. I gave them a full status report on the business end. I also informed them that I had been told (which I had) by the Immigration and Naturalization people that permanent visa openings came without much notice, as they were on a quota basis and that if

O'Byrne contends that during this period of time, he was busy trying to start a business venture for the Pfefferles. He considered and investigated the building of a motel in the Government Camp area and later unsuccessfully attempted to "get the Pfefferles involved" in a motel in Newport in which he had an interest. By this time, interest rates were rising rapidly and the development business in Oregon was on the down side.

On June 24, 1980, the Pfefferles wrote to O'Byrne telling him that they did not want to face "another year and a half of indecision and hope." They had an opportunity to "go into a hotel complex" in Canada with some friends and imposed a deadline by writing: "If the social insurance numbers or green cards are not within your grasp by mid-August we have decided to scrap the move plans and get on with our lives up here." They asked O'Byrne a direct question: "If we are forced to go this route, would this create any difficulty for you as far as coming up with the money?"

The Pfefferles had not received the green cards by mid-August 1980, but after consulting with O'Byrne by telephone decided to sell their house in British Columbia and go south to seek their fortune. On Saturday, November 1, 1980, the Pfefferles, one year behind their original schedule, crossed the border at Oroville, Washington. O'Byrne stayed in his office all that day to answer by telephone "any questions an inspector might have at the border regarding the authenticity of [the Pfefferles'] investment."

Apparently the Pfefferles told the border officials that they were going to Arizona for the winter. They were issued permits which allowed them to stay in the United States until May 1, 1981. They stayed overnight in Portland and conferred with O'Byrne who agreed to meet with them later in the month in Phoenix. By this time it was mutually agreed that Arizona presented a better opportunity for real estate development than Oregon.

The year running from November 1, 1980, through

---

something opened up, it would be in November and I would simply have to check then. I also told them I was informed (and I had been) that for what we had in mind a 'B-1 Visitors for Business Purpose Visa' would be available anyway."

October 31, 1981, brought the Pfefferles no success in obtaining green cards or in entering a business venture. O'Byrne made several trips to Phoenix. At first he suggested that they jointly form a company to buy land and build single family dwelling units. Nothing came from these plans. Later O'Byrne paid $2,000 down as earnest money on a residence and suggested that they turn it into a multi-ownership investment and sell time-shares to the Pfefferles' acquaintances in Canada. The Pfefferles and O'Byrne made unsuccessful trips to Saskatoon and Calgary on this project.

In March 1981, the Pfefferles informed O'Byrne that because they had no current income their financial situation was rapidly going downhill. It was agreed that O'Byrne would repay part of the principal and interest. The agreement was described by Ann Pfefferle: "O'Byrne should pay us anything he owed us over $50,000 and we should receive $2,500 per month until something was going." In the following months O'Byrne did pay the Pfefferles these amounts:

| April 1981 | $2,500 |
| April 1981 | $5,660 |
| May 1981 | $2,500 |
| June 1981 | $2,500 |
| July 1981 | $1,000 |
| August 1981 | $6,000 |
| September 1981 | $4,000 |

According to the Pfefferles' calculations this left a principal balance of $32,500 plus interest in the amount of $2,146.65 due as of September 30, 1981.

In late October 1981, after the Pfefferles were unable to get a satisfactory answer from O'Byrne as to when they could expect the payment of the balance of their money, they drove to Portland and hired a lawyer. A demand was made by the lawyer on O'Byrne and he replied that the Pfefferles were his "business partners." An action was then filed by the Pfefferles against O'Byrne in the United States District Court praying for a judgment in the amount of $35,000 plus punitive damages and attorney fees.[9] The Pfefferles' lawyer filed the complaint in this matter with the Oregon State Bar.

---

[9] The case in the Federal District Court was settled by O'Byrne making a cash payment to the Pfefferles and giving them a new promissory note for the balance secured by a trust deed.

We must decide if an attorney-client relationship existed between O'Byrne and the Pfefferles. O'Byrne in his answer alleged the relationship as "co-venturers." We know O'Byrne was an attorney but we must determine if the Pfefferles were clients.

■ ■ A client is a person who employs or retains an attorney to advise, assist or act for him or her in any legal business. Black's Law Dictionary (4th Edition 1951). A client is a person who applies to a lawyer for advice and direction on a question of law. Ballentine's Law Dictionary (3rd Edition 1969). A client is a person who consults or engages the services of a legal advisor. Webster's Third New International Dictionary, (1971). The relationship of attorney and client can be inferred from the conduct of the parties. *In re Robertson,* 290 Or 639, 648, 624 P2d 603 (1981); *Matter of Palmieri,* 76 NJ 51, 385 A2d 856, (1978). A formal agreement for payment of a fee is not necessary to create the relationship of attorney and client. *Sitton v. Peyree,* 117 Or 107, 115, 241 P 62, 242 P 1112 (1926).

O'Byrne contends that his relationship with the Pfefferles was that of "co-venturers" or business "partners" for the purpose of real estate investment or development and that the immigration matter was merely incidental. He points out that he did not mix his "investment deals" with his law business and that he kept separate files and put the investment money in a personal account separate from the law office and trust accounts. He argues that the Pfefferles were not clients because he did not have a fee arrangement with them and did not keep track of his time or bill them for his services.

The Pfefferles' primary purpose was to become legal permanent residents of the United States. To them going through the process of making an investment was only the means to an end. This primary purpose was shown in the Pfefferles' first contact with O'Byrne. Prior to meeting O'Byrne in his law office, Ann Pfefferle had forwarded a written note to him through Mrs. Davidson. The first question on the note was: "What do we need or require in order for both of us to work in the USA while Todd is attending college?" That question was followed by the statement: "If investment is quicker, we can go that route—$20,000—$40,000—$60,000 available."

■ We find by clear and convincing evidence that the relationship of attorney and client was established between O'Byrne and the Pfefferles for the purpose of obtaining permanent resident visas for the Pfefferles. In addition to the Pfefferles' intent to hire O'Byrne as a lawyer, this finding is supported by the following acts by O'Byrne: (1) contact with the immigration authorities on several occasions, (2) letters to the Pfefferles about green cards, (3) contact with the social security authorities, (4) all letters to the Pfefferles were written on his attorney at law letterhead, (5) placement of the funds in his attorney at law savings account, (6) receipt of checks from Pfefferles which were made payable to O'Byrne as an attorney at law and (7) being available in his office when the Pfefferles crossed the border to answer questions from the immigration people.

Next, we must decide what O'Byrne's duties and obligations were in connection with the $46,000 sent to him by the Pfefferles. Was the delivery of the money a loan? Was the relationship of lender and borrower created? Was the $46,000 trust funds? Was O'Byrne required to hold the money in trust for the Pfefferles?

A loan of money is defined in *Coe v. First National Bank and Trust Company*, 219 Kan 352, 354, 548 P2d 486 (1976), as:

"* * * [A] contract by which one delivers a sum of money to another and the borrower agrees to return at a future time a sum equivalent to that which he borrowed usually with interest. * * * A loan is made when the borrower receives money over which he exercises dominion and which he expressly or impliedly promises to return. One of the elements of a loan is delivery of money so that the borrower may exercise dominion and ownership over it."

*See also General Electric Credit Corp. v. State Tax Commmission*, 231 Or 570, 591, 373 P2d 974 (1962); *Tiernan v. Carasaljo Pines*, 51 NJ 393, 404, 143 A2d 892, (1958).

■ Although the overall proposed transaction between O'Byrne and the Pfefferles was to be a hybrid scheme containing features of both a loan and a joint venture, we find that the delivery of the $46,000 created a loan. The transaction was to take place in two steps: (1) The $46,000 was to be delivered to O'Byrne as a loan and he was required to pay interest for the

use of the money, and (2) If a satisfactory real estate development was found, then O'Byrne would pay the $46,000 into the joint venture and issue to the Pfefferles stock in a corporation, partnership shares or other appropriate evidence of joint ownership. If a satisfactory joint venture was not found, then O'Byrne would repay the principal sum to the Pfefferles with interest. Because the second step never took place the $46,000 continued to be a loan and when the Pfefferles demanded payment, O'Byrne was unable to pay.

From the very first meeting with O'Byrne, the Pfefferles were on notice that they were to receive interest on their money. Ann Pfefferle's notes of that meeting in part read that O'Byrne "will pay us interest on our money." After receiving the balance of $26,000, O'Byrne sent the Pfefferles a promissory note in the amount of $46,000 payable one year after March 26, 1979, together with interest at the rate of 10 percent per annum. The Pfefferles accepted the note, lost it, asked for and received a substitute and then found the original. On June 24, 1980, when the Pfefferles were considering giving up their plans to move to the United States, they wrote and asked O'Byrne if he would have any difficulty "coming up with the money." Commencing in April 1981, the Pfefferles at various times computed the interest due on the promissory note. As of April 1, 1981, O'Byrne owed the Pfefferles approximately $9,660 in interest. The $5,660 paid by O'Byrne on April 16, 1981, was a payment of interest only.

Not until July 17, 1981, when the Pfefferles wrote to O'Byrne asking him to discontinue any activity on their behalf, did they ever use the term "in trust." In that letter they wrote: "In March 1979, an additional $26,000 was sent to you to be held in trust [at] 10% per annum." In fact the letter of enclosure of March 16, 1979 does not use the term "in trust" but in relevant part is as follows:

> "Enclosed please find our bank draft for $26,000 U.S. Funds. This will complete our investment obligation to the $46,000 required amount."

We find that the $46,000 delivered to O'Byrne was a loan and created the relationship of lender and borrower between the Pfefferles and O'Byrne. The Pfefferles were experienced in the business world, at least to the point where they should have been able to recognize the difference between

a loan of money and a trust account. William Pfefferle's resume states that he was 40 years of age in 1978, had completed high school and spent his entire adult life managing hotels. He stated: "I have the capabilities to allow me to operate most any size hotel or motel. I would be able to handle the total operations including all accounting functions." Ann Pfefferle is a year younger than her husband and has a high school education. She had worked at a variety of responsible office management positions. She described her position with a law firm: "Office Manager/Accountant for this firm of six partners. Responsible for all accounting data including the trust accounts." The Pfefferles must have realized from their very first meeting with O'Byrne that if he were going to pay them interest that he was to have the use of their money. Interest is money paid for the use of money. One of the elements of a loan of money is that the borrower may exercise ownership and control over it. *Coe v. First National Bank and Trust Company, supra.* The funds therefore were not held in trust as charged by the Bar.

Now that we have determined that the relationship of attorney and client existed between O'Byrne and the Pfefferles and the delivery of the $46,000 was a loan and not trust funds, we will proceed to examine the three causes of the complaint.

The first cause alleges that O'Byrne violated DR 5-101(A). Under that Disciplinary Rule, except with the consent of the Pfefferles after full disclosure, O'Byrne could not accept the employment if the exercise of his professional judgment on behalf of the Pfefferles would be or reasonably might be affected by his own financial business, property or personal interests. There would have been no question if the Pfefferles had simply employed O'Byrne to represent them in their immigration matter. The problems arose from the conditions that were attached to the employment. The transfer of the $46,000 was to be a loan until a satisfactory real estate development was found at which time the relationship would be converted into a joint venture.

O'Byrne in his brief to this court defends against this cause of complaint by merely stating that there was full disclosure and the Pfefferles consented to the entire transaction. The evidence does not support O'Byrne's contention. He

548

never at any time advised the Pfefferles to obtain independent advice. There is nothing in the record that indicates O'Byrne explained the pitfalls of the business relationship. He did not advise them that they needed security for the loan. *In re Drake,* 292 Or 704, 716, 642 P2d 296 (1982). This court in *In re Boivin,* 271 Or 419, 425, 533 P2d 171 (1975) quoted from Wise, Legal Ethics 273 (2ed 1970):

> "If there is the slightest doubt as to whether or not the acceptance of professional employment will involve * * * a conflict between the interests of a client and that of the attorney * * * the employment should be refused."

We find by clear and convincing evidence that O'Byrne is guilty under the first cause of violating DR 5-101(A).

The second cause alleges that O'Byrne violated DR 5-104(A). In the case of *In re Montgomery,* 292 Or 796, 797, 643 P2d 338 (1982), this court divided that Disciplinary Rule into four elements:

> "A lawyer shall not (1) enter into a business transaction with a client if (2) they have differing interests therein and if (3) the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless (4) the client has consented after full disclosure."

As to the first element we have already found that an attorney-client relationship existed. A loan from a client to a lawyer of a substantial sum of money is a "business transaction." In the second element, "differing interests" refers to a business transaction "in which the interests of the lawyer and the client are not identical." The relationship of debtor and creditor by its nature creates adverse positions for the parties. *In re Drake, supra,* 292 Or at 713-14.

The third element requires a showing that the Pfefferles expected O'Byrne to protect them by the exercise of his professional judgment. The record in this case, as noted above, is filled with letters and telephone calls by the Pfefferles to O'Byrne seeking his professional advice. O'Byrne himself confirmed this by his letter of April 19, 1979, when he wrote to the Pfefferles that he felt an obligation "to not only handle your immigration matter but also to make you a decent return on your investment."

As to the fourth element of DR 5-104(A), the

lawyer has an obligation to tell the client that their interests are adverse and what effects the differing interest may have upon the lawyer's ability to exercise his independent professional judgment. "The lawyer must *at least* advise the client to seek independent counsel." *In re Bartlett,* 283 Or 487, 496, 584 P2d 296 (1978). (Emphasis in original.) O'Byrne did not make a full disclosure or advise the Pfefferles to seek independent counsel.[10]

We find by clear and convincing evidence that O'Byrne is guilty of violating DR 5-104(A).

■ In In the third cause of complaint it is alleged that O'Byrne violated DR 9-102(A) and (B)(3) and (4) by commingling the Pfefferles' funds with his own and using the clients' funds for unauthorized purposes. When we decided that the $46,000 was a loan, for all practical purposes we also decided that O'Byrne was not guilty of this cause of complaint. A lawyer cannot commingle his own funds or use them for unauthorized purposes. One of the elements of a loan of money is that the borrower exercises dominion and ownership over it. *Coe v. First National Bank and Trust Company, supra.* We find O'Byrne not guilty of the third cause of complaint.

There are five disciplinary review cases[11] in which

---

[10] This court in the case of *In re Brown,* 277 Or 121, 134, 559 P2d 884 (1977), said:

"The Bar's Rules of Professional Conduct do not prohibit joint ventures by attorneys with clients, but it is stated that if they have 'differing interests' it shall not be condoned 'unless the client has consented after full disclosure.' DR 5-104(A). The Rule does not state that such 'disclosure' be in writing, but prudence dictates that attorneys should reduce the disclosure and understanding with clients to some form of written document. Otherwise, they must bear the consequences."

Here, although a joint venture for the development of real estate was never created, the same advice should apply to an agreement to enter into a future joint venture.

It is interesting to note that the Oregon State Bar Professional Liability Fund Plan was amended, effective January 1, 1983 to include the following exclusion:

"Coverage under the [Professional Liabilty Fund Coverage] Plan does not apply to any claim arising out of a business transaction in which the [lawyer] participates with a client unless the disclosure and consent required by DR 5-104(A) has been reduced to writing and forwarded to the Professional Liability Fund prior to the occurrence giving rise to the claim."

Lawyers' Deskbook and Directory, 1984 Oregon State Bar, Page 85.

[11] It is not claimed that this list is complete. It is representative only.

this court has previously found lawyers guilty of violating *both* DR 5-101(A) *and* DR 5-104(A). Those cases and the respective sanctions are *In re Baer,* 298 Or 29, 688 P2d 1324 (1984) (60 day suspension); *In re Stevenson,* 297 Or 452, 683 P2d 550 (1984) (two and one-half year suspension); *In re Robeson,* 293 Or 610, 652 P2d 336 (1982) (disbarred); *In re Drake,* 292 Or 704, 642 P2d 296 (1982) (three year suspension); *In re Brown,* 277 Or 121, 559 P2d 884 (1977) (30 day suspension).

In the case of *In re Robeson, supra,* the lawyer was found guilty in seven separate causes of violating DR 5-101(A) and DR 5-104(A). He was also found guilty of misappropriating funds and therefore guilty of violating DR 9-102(A) and (B). In addition he was found guilty of violating DR 7-101(A)(3).

In the case of *In re Stevenson, supra,* this court accepted a Stipulation for Discipline. The amended complaint listed 28 separate causes. The lawyer stipulated to six violations of DR 5-105(A), (B) and (C), one violation of DR 5-104(A), four violations of DR 5-101(A), and one violation of DR 6-101(A)(3). The Board of Governors agreed to withdraw the remaining causes in exchange for the stipulation.

In the case of *In re Drake, supra,* the lawyer was found guilty of violating DR 1-102(A)(4), DR 5-101(A) and DR 5-104(A). He was suspended for a period of three years. We said: "The violation of DR 1-102(A)(4) is particularly significant because it involved dishonesty, fraud, deceit or misrepresentation." 292 Or at 718.

In the case of *In re Baer, supra,* the lawyer was found guilty of violating DR 5-101(A), DR 5-104(A) and DR 5-105. He was suspended for a period of 60 days and required to take and pass the professional responsibilty examination. There was no finding of fraud or misrepresentation.

In the case of *In re Brown, supra,* the lawyer was found guilty of violating DR 5-101(A) and DR 5-104(A). He was suspended for a period of 30 days. He was found not guilty of violating other disciplinary rules. We specifically found that there was no evidence that the lawyer acted fraudulently or absconded with any funds.

In cases involving *only* a violation of DR 5-104(A), we

have given the following sanctions.[12] *In re Scannell,* 289 Or 699, 617 P2d 256 (1980) (60 day suspension followed by a two year period of probation in which the lawyer could not engage in private practice); *In re Montgomery,* 292 Or 796, 643 P2d 338 (1982) (public reprimand); *In re Whipple,* 296 Or 105, 673 P2d 172 (1983) (three month suspension); *In re Montgomery,* 297 Or 738, 687 P2d 157 (1984) (7 month suspension).

*In re Boyer,* 295 Or 624, 669 P2d 326 (1983), contains a comprehensive list of sanctions previously given by this court in conflict of interest cases. It includes cases in which the lawyer was found guilty of violating other disciplinary rules under Canon Five.

An examination of the above decisions shows that this court has drawn a line between cases in which the lawyer is guilty of only a conflict of interest and cases in which the conflict has been aggravated by fraud, dishonesty or misappropriation of funds. In the former class of cases, the sanctions have been a public reprimand or a suspension for less than one year. In the latter class of cases, the suspensions have exceeded one year and in one case, permanent disbarment was ordered.

In this case there is no evidence of fraud or dishonesty by O'Byrne. We have found that he did not commingle funds or use them for an unauthorized purpose.

T. Leonard O'Byrne is suspended from the practice of law for a period of four months effective February 12, 1985.[13] The Oregon State Bar is awarded costs. ORS 9.536(4).

---

[12] We could not find any cases involving only a violation of DR 5-101(A).

[13] See ORAP 11.03.