Argued and submitted September 12, accused disbarred November 17, 1994

In re Complaint as to the Conduct of

# ROGER G. WEIDNER,
*Accused.*

(OSB 91-124; SC S36671)

883 P2d 1293

Roger G. Weidner, accused, argued the cause and filed the briefs *pro se.*

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, argued the cause for the Oregon State Bar. Susan Roedl Cournoyer, Assistant Disciplinary Counsel, Lake Oswego, filed the response for the Oregon State Bar.

Before Carson, Chief Justice, and Gillette, Fadeley, Graber, and Durham, Justices.

PER CURIAM

## PER CURIAM

In this Bar disciplinary case, a trial panel found the accused guilty of numerous violations of criminal statutes and of 19 violations of disciplinary rules. The trial panel's decision was disbarment.[1] Under ORS 9.536(2), review by this court is automatic. Review is conducted *de novo* under ORS 9.536(3).

The accused has raised various defenses to the Bar's charges of disciplinary misconduct contained in its amended complaint against the accused. The accused relies on a general defense of "necessity." He does not, however, apply that defense to the Gannon Estate charges. Therefore, before considering the general defense of necessity, we will determine whether the Bar has proven its charges related to that estate.

## GANNON ESTATE

The accused drafted a will that left Mr. Gannon's estate *to a minor political party in California* but that expressly disinherited Gannon's children. After Mr. Gannon's death, the accused was appointed personal representative and also served as lawyer for the personal representative of that estate. As lawyer, the accused paid himself $950 for estate attorney fees from the estate without applying to the probate court or obtaining an order from that court, as required by ORS 116.183.

The accused also withdrew $14,000 of the Gannon Estate's funds to pay himself for various services that he had performed prior to Mr. Gannon's death. The accused did not file a claim in the estate and did not observe the procedures applicable to a claim before paying himself.[2] Although the

---

[1] In January, 1987, the accused transferred voluntarily to inactive status as a member of the Oregon State Bar after 17 years of active membership. That summer he was suspended for failure to pay Bar dues. He has not been reinstated nor has he resigned from membership. Thus, after early 1987, he has not been and is not now eligible to practice law. He remains, however, a member of the Bar, albeit one whose status is suspended and inactive.

[2] ORS 115.105 provides:

"A claim of a personal representative shall be filed with the clerk of the court within the time required by law for presentment of claims. Upon application by the personal representative or by any interested person the claim may be considered by the court on the hearing of the final account of the personal

accused purported to pay himself for legal services at hourly rates appropriate for legal work, many of the services that the accused has enumerated to justify the $14,000 payment are not legal services but instead are in the nature of companionship, *e.g.*, spending time with the decedent and taking him various places. After the accused paid himself, Gannon's adult children successfully contested the will in probate court. In 1990, that court required repayment to the estate of a portion of the improper $14,000 payment that the accused made to himself.

The accused does not dispute the foregoing facts. He contends, however, that the defense of laches prevents the Bar from bringing a complaint against him for this conduct in 1986 and 1987. He claims that the defense applies to this disciplinary proceeding, and that the time delay between the events and the filing of the complaint in 1993 is by itself sufficient to establish the defense.

In *Ellis v. Roberts*, 302 Or 6, 10, 725 P2d 886 (1986), this court stated three elements that must be present before laches will apply:

> "The elements of laches are [1] delay by a party, [2] with knowledge of relevant facts under which it could have acted earlier, [3] to the substantial prejudice of an opposing party."

In *Stephan v. Equitable S & L Assn.*, 268 Or 544, 569, 522 P2d 478 (1974), this court held:

> "In order to constitute laches there must have been full knowledge of all of the facts, concurring with a delay for an unreasonable length of time, and laches does not start to run until such knowledge is shown to exist. *Wills v. Nehalem Coal Co.*, 52 Or 70, 89, 96 P 528 (1908); *Kelly v. Tracy*, 209 Or 153, 172, 305 P2d 411 (1956). In addition, the delay must result in substantial prejudice to the defendant to the extent that it would be inequitable to afford the relief sought against the party asserting laches as a defense. *Dahlhammer and Roelfs v. Schneider Exec.*, 197 Or 478, 498, 252 P2d 807 (1953); *Hanns v. Hanns*, 246 Or 282, 305, 423 P2d 499 (1967)."

---

representative or prior to the hearing of the final account upon notice to interested persons."

*See also In re Morrow*, 303 Or 102, 106, 734 P2d 867 (1987) (In a Bar disciplinary case, "lengthy delay from the accused's conduct to the filing of charges [without prejudice] is not a defense but bears on the proper sanction.").

■ No prejudice to accused is alleged here, nor is proof of any prejudice found in the record. We, therefore, do not need to decide whether laches can ever be a defense to a disciplinary case. The defense of laches is not available to the accused in this case even if we assume, without deciding, that it might be available in some other disciplinary case where all three required elements are present.[3]

The accused also seeks to excuse his conduct of taking money from the estate's assets without first making and presenting a claim, indicating that he was not familiar with probate procedure. He pleads ignorance of the requirement that a claim had to be made or that, as to estate lawyer fees, prior approval by the court was statutorily required before payment.

The Bar alleges that the foregoing conduct violates DR 1-102(A)(3) and (4) and DR 2-106(A). DR 1-102(A)(2), (3), and (4) provide:

"(A) It is professional misconduct for a lawyer to:

"* * * * *

"(2) Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law;[4]

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

"(4) Engage in conduct that is prejudicial to the administration of justice[.]"

DR 2-106(A) provides in part:

"A lawyer shall not * * * charge or collect an illegal or clearly excessive fee."

---

[3] The delay is not as extreme as it appears. The amount of overpayment that the accused made to himself was not decided, on objections to the accused's final account, until 1990.

[4] We quote subsection (2) because it will be relevant to charges that will be discussed later in this opinion, not because it is alleged to be violated in the Gannon Estate matter.

We conclude that clear and convincing evidence proves that the accused violated DR 1-102(A)(3) and (4) and DR 2-106(A). At the time of violation of the statutory requirements, the accused had practiced law for almost two decades. We do not credit his claim of ignorance. The pertinent statutes are plain and easy to find. The accused must have known that he was bypassing the statutes and thereby violating them at the time that he took $14,000 from the estate for his own benefit. Moreover, when he billed the estate at legal service rates for services that turned out not to be professional services, the accused engaged in misrepresentation and collected an excessive fee.

## NECESSITY DEFENSE

The accused attempts to avoid the legal effect of his conduct by interposing in this Bar disciplinary proceeding the defense of "necessity," sometimes known as the "choice of evils." That defense is set forth in the criminal statutes.[5]

The accused alleges, as to all causes of complaint except the Gannon Estate matter, that his conduct is justified under the defense of "necessity." The accused states his defense as follows:

"Excluding the Gannon estate matter, every action taken by the accused has been absolutely necessary to recover for the accused['s] client[s'] property shamelessly stolen from those clients by the attorneys, judges and sheriff deputies named in the Third Party Complaint on file."

He also alleges:

"Each and every act of the accused, complained of by the Bar since December of 1987 has been necessary to thwart and

---

[5] ORS 161.200 provides:

"(1) Unless inconsistent with other provisions * * *, conduct which would otherwise constitute an offense is justifiable and not criminal when:

"(a) That conduct is necessary as an emergency measure to avoid an imminent public or private injury; and

"(b) The threatened injury is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue.

"(2) The necessity and justifiability of conduct under subsection (1) of this section shall not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder."

expose the massive amount of criminal conduct on the part of the third-party defendants in aiding and abetting lawyers Brown and [another lawyer]."[6]

The accused alleges that the necessity defense (and his claim for damages from "third-party defendants") arises out of his efforts to recover property converted by another lawyer from an estate in Multnomah County and property converted by a different lawyer from New Wine Ministry in Clackamas County. The accused alleges conspiracy to aid and abet those conversions and that the conspirators include 13 trial judges in the Portland metropolitan area, a former justice of this court,[7] a federal trial judge,[8] district attorneys in Multnomah and Clackamas counties, a few sheriff's deputies, several members of the Bar disciplinary staff, and a number of practicing lawyers, including the two lawyers alleged to have converted the separate properties. Those persons are referred to by accused as the "third party defendants."

The accused alleges that the conversions occurred in the following ways:

"4. In May of 1985, third party defendant Milton Brown murdered his business partner Donald Kettleberg by writing 'do not resuscitate' on Kettleberg's medical records. Brown forged fourteen corporate documents, and has since Kettleberg's death converted $35,000,000 in Kettleberg estate assets.

"5. In July of 1990, third party defendant Ken Schmidt wrongfully recorded a quitclaim deed and converted $1.5 million in property belonging to New Wine Ministry."

The accused, who at the relevant times remained in inactive status as detailed in note 1 above, alleges that he was

---

[6] The accused also alleged in his answer to the Bar's charges, as a "third-party" complaint, that he was entitled in the disciplinary proceeding to $50 million general damages.

[7] That former member of this court joined in acquitting the accused of all the different disciplinary charges alleged by the Bar in the prior case of *In re Weidner*, 310 Or 757, 801 P2d 828 (1990).

[8] The accused added the federal judge to his list of alleged conspirators only after that judge ruled adversely to the accused's claim in federal court. After the trial panel decided for disbarment in the disciplinary case, the accused states in his brief that: "The trial panel, by their decision, have themselves become part of the on-going conspiracy."

"retained by Ms. Kent, sole beneficiary of the Kettleberg estate, to recover the property converted by attorney Brown" and that he was "hired by Pastors Helen Jones and Chet Jones to recover the property converted by attorney Schmidt."

The accused claims that the defense of "necessity" is borne out by the truth of his charges of conspiracy and corruption. The truth of his charges is conclusively proved, he states, because he makes accusations of wrongdoing, corruption, and conspiracy in court to the various judges and lawyers and in their presence but they do not respond by denying his charges, thereby indicating conclusively, as the accused sees it, the accuracy of those charges. The accused fails to see that there are other possible explanations, not consistent with conspiracy and corruption, why the persons that he accused did not orally deny or respond to his accusations against them.

The accused also advises us that he has complained about the conspiracy to United States Attorneys General Thornberg and Reno as well as the Governor of Oregon, the President of the United States, and various other officials. He has maintained contact with the Federal Bureau of Investigation over an extended period of time concerning his claim of corruption and conspiracy. His brief includes a letter to him from the FBI, in which that agency, after consideration of the accused's corruption and conspiracy charges, declines to participate on the basis that the rulings about which the accused complains are discretionary rulings permitted by law, not ones establishing a conspiracy. The FBI letter of June 15, 1993, to the accused also provides in part:

> "In the matter concerning your allegations of widespread corruption within the judicial system, this too is being declined further investigation as there does not appear to be adequate evidence indicating corruption."

By its terms, the defense of necessity applies to a criminal case. ORS 161.200. That is not the nature of this disciplinary proceeding, even though the accused admits, in this case, that he has been found guilty of crimes in other proceedings. Even assuming the availability of that defense,

it would not be supportable on the present record.[9] We turn to the Bar's other charges of misconduct.

### KATHY MASON PROPERTY TRESPASS

Because he had heard of the accused's efforts to help some people involved with the court system, Chet Jones contacted the accused in 1990 and asked for his assistance regarding a dispute about the ownership of certain real property.[10] The accused attempted to help the Joneses in their dispute with the record owner, Kathy Mason. As a result, Mr. Jones, his wife, and the accused were all named defendants in a legal action brought by Mason concerning the real property. Thereafter, a judgment quieting title was entered in Clackamas County Circuit Court, deciding that the accused had no interest in the real property. The court specifically enjoined the accused from making any claim of ownership concerning the property in the future.

Notwithstanding the judgment that he held no interest and the court's injunction against claiming such an interest or interfering with the ownership of Mason, the accused thereafter went on the land and claimed to be its owner. As a result, the accused was convicted of criminal trespass by a Clackamas County jury.

The accused contends in a "Third Party Complaint," filed as a part of his answer to the disciplinary charges in this case, that all Clackamas County judges involved in the Mason quiet title action and the criminal trespass conviction are part of a conspiracy against the accused.[11]

With regard to the Mason real property, the accused is charged with violating DR 1-102(A)(2), (3), and (4), quoted above, and DR 7-102(A)(2) and DR 7-106(A). DR 7-102(A)(2) provides:

---

[9] For example, the record before us is insufficient to examine, let alone pass upon, the propriety of Brown or his lawyers in his business dealings with Kettleberg, the Kettleberg estate, or other business associates. The same is true of lawyer Schmidt and the Mason property, discussed later in this opinion.

[10] This property is referred to in the accused's pleading, quoted herein, as "belonging to New Wine Ministry."

[11] The judge who presided over the criminal trespass trial was added by the accused to his list of conspirators after the jury returned its guilty verdict.

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"\* \* \* \* \*

"(2) Knowingly advance a claim or defense that is unwarranted under existing law except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law."

## DR 7-106(A) provides:

"A lawyer shall not disregard \* \* \* a standing rule of a tribunal or a ruling of a tribunal made in the course of a proceeding but the lawyer may take appropriate steps in good faith to test the validity of such rule or ruling."

The accused's conduct was criminal as found by the jury. The accused knew that by law he was not the real owner of the land. His claim was knowingly unwarranted at the point in time that he went upon the land and claimed ownership. He indicates that the trespass was in furtherance of the Jones' claim to the land. His conduct violated Mason's rights and the court's judgment and the injunction contained therein. In the setting in which it occurred, by attempting to continue the claim of the Jones to Mason's land after he had lost the Jones' case in court, the accused "willfully disobeyed an order of a court requiring the member [of the Bar] to do or forbear an act connected with the legal profession," thereby violating ORS 9.527(3). In addition to being a criminal act, the accused's trespass interfered with and was prejudicial to the administration of justice in the courts. The accused, by clear and convincing evidence, is guilty as charged in the disciplinary complaint.

## MISSION WORLD PEACE FUND-RAISING LETTER

During the mid 1980's, the accused started assisting Janette Kent regarding her claim to the Estate of Donald E. Kettleberg, who died in 1985. Using various lawyers other than the accused, Kent won a legal action by establishing a contract to make a will in her favor. That action resulted in a constructive trust being imposed on the assets of the Kettleberg estate.

Mr. Kettleberg had been in business with lawyer Milton Brown involving a number of entities and transactions. Kent, assisted by the accused in various ways, has been, and is, involved in protracted litigation with Brown over assets and income from the various business entities involved. That litigation has been prosecuted in the probate of Kettleberg's estate in Multnomah County probate court. It also has been prosecuted in other courts, including the United States District Court for the District of Oregon.[12] That litigation — in which Kent was represented in court by lawyers other than the accused, who was at all relevant times in inactive status and suspended — has been costly. As a result, Kent has sought financial assistance relating to this protracted litigation from various sources.

One such effort to obtain financial assistance was made through a solicitation letter signed by the accused and sent to potential contributors or lenders. The letter solicited loans to an entity, established and controlled by Kent, called Mission World Peace. That letter represented that Kent had assigned to Mission World Peace all her interest in the estate, *i.e.*, in the "constructive trust" regarding her beneficial interest in the estate. That representation was not true when made by the accused to persuade others to loan their money for the purposes stated.

In his sworn deposition in this disciplinary matter, the accused testified repeatedly that no assignment had been made at the time that he signed the letter and caused it to be mailed and delivered representing that such an assignment was in place. The accused's testimony under oath included the following questions and answers:

"Q At the time the first page [of the letter] was sent out did you believe that Ms. Kent had transferred any rights she had in the matters that are set out here in Mission World Peace?

"A No. She has transferred an interest in it to raise the funds. She was transferring interest. * * *

"* * * * *

---

[12] The accused, Ms. Kent, and Robert Wright participated as named plaintiffs in the federal court action. After a ruling by the United States District Judge, adverse to plaintiff, the judge was included by the accused as being among those he considers conspirators.

"Q   Second sentence says, 'She has assigned all her beneficial interest in her claims against Brown to a non-profit organization she founded, Mission World Peace.' Was that statement true?

"A   Her beneficial interests? She had not in fact — there was no assignment. * * *

"Q   * * * Did you believe when you signed this letter that she had assigned all of her beneficial interest in her claims to Mission World Peace?

"A   If she hadn't, she would. The beneficial interest was to be transferred as a means of repaying these loans. That's my recollection.

"* * * * *

"* * * There had not been, as I recall, a written assignment made at the time this letter was sent. The intent was it was going to be — it was an executory kind of thing that was going to be done. That was the plan.

"Q   Did it get done?

"A   No. * * *.

"Q   How many people were sent the letter that is the first page of Exhibit 1?

"A   Maybe 500 to a thousand."

Concerning the solicitation letter and its representations, the Bar has charged the accused with violation of DR 1-102(A)(3), quoted above. The foregoing record provides clear and convincing evidence of his guilt as charged.

## INACCURATE NOTARIZATIONS

In the course of assisting Kent, the accused located witnesses having information about the business transactions between Kettleberg and Brown. The witnesses also had information about Brown's business activities after Kettleberg's death. The statements of those witnesses were typed in affidavit form for the purpose of submission to the courts.

The accused notarized three such affidavits well after his notarial commission had expired. In one instance, he also notarized the signature of a former business associate of Brown, who was complaining about Brown's business practices, before that business associate had in fact signed the typed "affidavit." The accused admits that he notarized that

affidavit before it had been signed, indicating that it had been subscribed and sworn to in his presence, when it had not. He admits that he stated a specific date for the expiration of his notarial commission on all of the affidavits involved in the Bar's charges but that the date stated was not accurate. He insists that he did not know that his commission had expired many months earlier. He offers no reason why he wrote on the affidavits the specific date shown by them as the time his commission would expire other than to say that he simply had that date in his head and used it. The date shown by the accused on all of the affidavits was some two years later than the actual expiration of his notarial commission.

In Oregon, the practice of providing notarial services is regulated by statute. ORS 194.014 provides in part:

> "Every individual person, before entering upon the duties of a notary public, shall file with the Secretary of State a completed application for appointment and commission as a notary public."

When application is granted, the appointment is for four years only, and notarial acts may only be performed during that term of appointment. ORS 194.012 in part provides:

> "The term of office of a notary public is four years commencing with the effective date specified in the notarial commission. A notary public may perform notarial acts during the term of the commission, or until the commission is suspended."

ORS 194.515 requires appearance before the notary prior to notarization. ORS 194.990(1) sets out criminal penalties for certain notarial violations, as follows:

> "(a)   A notary who knowingly and repeatedly performs or fails to perform any act prohibited or mandated respectively by ORS 194.005 to 194.200 or 194.505 to 194.595, or rules adopted thereunder, is guilty of a Class B misdemeanor.
>
> "(b)   Any person not a notary public who knowingly acts as or otherwise impersonates a notary public is guilty of a Class B misdemeanor."

In Oregon, repeatedly notarizing documents without a commission and indicating that a document was sworn and signed before a notary although it was not yet signed may be a

crime. *See* ORS 194.990(1) (acting as a notary knowing you are not violates criminal law); ORS 194.515 (notary must ascertain that person known and stated to have signed is the person signing). Exercising the authority of a notary and purporting to assure the reader of the document that the document was signed under oath when one is not authorized to give oaths or to act as a notary public is also, separately, contrary to law. ORS 194.990(1)(b). In this case, the documents were intended to be relied on, as sworn statements, by the courts and judicial system as well as by potential supporters of Ms. Kent. In other words, by affixing his name as notary, the accused represented to those who might read the affidavits, including the courts, that they were sworn before him personally and that he was a notary authorized to take such a sworn statement. Those representations were false.

The Bar's complaint charges the accused with violating criminal laws in this instance. By his own admission, the accused is guilty. He also has engaged in conduct prejudicial to the administration of justice concerning these notarized affidavits. We conclude that, by clear and convincing evidence, the accused's conduct violated DR 1-102(A)(2) and (3), quoted above, and that, if the misconduct occurred "in the legal profession," it also violated ORS 9.527(4).[13] Ms. Kent had other counsel in all of her state court proceedings. The accused refers to his role only by the verb "investigate." The accused may have been acting as an investigator when he notarized the documents. Therefore, proof that the accused's notarial misconduct was in the legal profession is not clear and convincing and, therefore, no violation of ORS 9.527(4) is made out in relation to the incorrect notarization. *See In re Benson,* 311 Or 473, 814 P2d 507 (1991) (holding that lawyer acting in his own self-interest concerning family property ownership by notarizing a known bogus deed violated ORS 9.527(4)).

---

[13] ORS 9.527(4) provides:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever, upon proper proceedings for that purpose, it appears to the court that:

"* * * * *

"(4) The member is guilty of willful deceit or misconduct in the legal profession[.]"

## CONTEMPT OF COURT

The accused admits that he has been convicted of contempt on several occasions, but discounts the meaning of those convictions by asserting that the convictions resulted from the claimed conspiracy previously outlined. Based on the accused's admission, we take the fact of convictions for contempt as established as charged in the Bar's complaint.

## SANCTION

This court generally follows the procedures set out in the American Bar Association Standards for Imposing Lawyer Sanctions (1991) (ABA Standards). The nature of the mental state that accompanies the accused's conduct — whether intentional, knowing, or otherwise — is of significance. The duties breached by the conduct found to violate the disciplinary rules are also important, as is the harm or potential harm caused by that conduct. Mitigating and aggravating circumstances also are factors considered.

As to mental state, the accused advises that he has acted intentionally in all respects. We previously dealt with his claim of ignorance about the probate law or the actual date of the expiration of his notary commission. In any event, those claims do not affect the admittedly intentional nature of his actions in violation of disciplinary rules.

The duties violated include those duties owed to the profession concerning public respect for its practitioners and to the courts concerning the administration of justice. In the matter of the notarial law violations, he violated the duty of diligence and loyalty to those he purported to assist. As we have noted previously, many of the acts of misconduct interfered with the administration of justice.

Harm in the form of public expense created by the interruptions and delays occasioned thereby is evident. Harm to the beneficiaries of the Gannon Estate is evident, although restitution of a portion of the funds unlawfully taken has been ordered by the probate court. Concerning the accused's notarial violations, it is clear that the accused's conduct created the potential for harm to Kent's interest by undermining the credibility of "affidavits" that were favorable to her position.

No remorse or reformation is shown.[14] Instead, explanations are offered to shift the blame to others. In this respect, the court notes that the accused's conduct regarding the Gannon Estate, although substantially lesser in degree, is somewhat similar in character to that which he accuses Milton Brown and his associates of committing. The accused took money from an estate without authority and for selfish reasons, just as he says Brown is doing. The accused's acts in the remaining matters are also accompanied by self-interest.

It also appears that the accused, in briefs filed in this court, contradicts his sworn testimony and does so to provide himself with an arguable defense to the Bar's charges. In his printed brief submitted to this court, the accused varies from his previous contention concerning whether there was in place an assignment by Ms. Kent to Mission World Peace at the time that he signed the fund-raising solicitation letter. Although he previously testified that there never was an assignment, he states in his brief:

> "Ms Kent did in fact initially assign her beneficial interest in the Kent v. Brown case to Mission World Peace. The assignment was intended to facilitate loans to Mission World Peace to enable that organization to finance the litigation against Milton Brown.

> "At the time of the assignment it was anticipated that the accused would place himself on active status and try the case as counsel for Mission World Peace. No funds were in fact borrowed and Ms Kent as Board Chairman of Mission World Peace reassigned the claim to herself. Ms Kent then made the assignment [to the accused personally] marked petitioner's exhibit 16 p. 204 so the accused could appear pro se and prosecute the claim against Milton Brown. The accused subsequently re-assigned to Ms Kent all property originally assigned by Ms Kent except Ms Kent's interest in Prindle Mountain Inc., which interest the accused still retains."

Efforts to mislead must be viewed seriously. The statements in the brief, when compared with the unequivocal denial in his sworn testimony that any assignment was in fact made to Mission World Peace, are of that character.

---

[14] Indeed, the accused directly advises us in his briefs that, even after the trial panel's decision of disbarment, he has continued to appear in court to accuse the presiding judge of corruption and to interrupt judicial proceedings thereby.

In mitigation, we note that there are no prior disciplinary violations.[15] Also, the accused has been punished for some of the same conduct, because he has been incarcerated on some of the criminal charges. Disbarment is, nonetheless, appropriate in this case both under the ABA Standards and under standards set forth in Oregon statutes. The ABA Standards state:

"5.11 Disbarment is generally appropriate when:

"(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation * * *; or

"(b) a lawyer engages in any other intentional conduct involving dishonesty, * * * or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice."

"6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes * * * potentially serious injury to a party, or causes a * * * potentially significant adverse effect on the legal proceeding."

An Oregon statute, ORS 9.527, in part provides:

"The Supreme Court may disbar, suspend or reprimand a member of the bar whenever * * *:

"(1) The member has committed an act or carried on a course of conduct of such nature that, if the member were applying for admission to the bar, the application should be denied;

"* * * * *

"(3) The member has willfully disobeyed an order of a court requiring the member to do or forbear an act connected with the legal profession;

"(4) The member is guilty of willful deceit or misconduct in the legal profession[.]"

It is clear that, applying subsection (1), the accused would not be admitted to practice law with the knowledge that, unreformed, he had committed the crimes and violations of which we have herein found him proved by clear and convincing

---

[15] Any delay in bringing the present charges in this case provides no mitigation. No claim of prejudice, or reformation in the interim, is present.

evidence to be guilty. He also qualifies for disbarment under subsection (3) of ORS 9.527. His misconduct also fits the kind of misconduct described in the ABA Standards, quoted above, providing that disbarment is an appropriate sanction. Even if the contemptuous conduct in court is not placed on the scales, the accused's other crimes and violations call for his disbarment.

The accused is disbarred.