Argued and submitted March 8, accused suspended from the practice of law for a period of one year July 7, 1995

# In re Complaint as to the Conduct of

## ARTHUR P. ALTSTATT,
*Accused.*

### (OSB 92-17; SC S41565)

897 P2d 1164

Stephen R. Moore, Portland, argued the cause and filed the briefs on behalf of the accused.

Lia Saroyan, Assistant Disciplinary Counsel, Oregon State Bar, Lake Oswego, argued the cause and filed a brief on behalf of the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating: Disciplinary Rule (DR) 5-101(A) (failing to make full disclosure of an actual or likely conflict of interest); DR 1-102(A)(4) (engaging in conduct prejudicial to the administration of justice); DR 2-106(A) (collecting an illegal fee); DR 7-106(A) (disregarding a rule of the court); and DR 7-102(A)(8) (knowingly engaging in illegal conduct or conduct contrary to a disciplinary rule). Before the commencement of the disciplinary hearing in front of the trial panel of the Disciplinary Board, the Bar withdrew the charge based on DR 7-106(A). After the disciplinary hearing, the trial panel found the accused guilty of violating DR 5-101(A), DR 1-102(A)(4), and DR 2-106(A), and not guilty of violating DR 7-102(A)(8).

The decisions reached by the trial panel regarding DR 1-102(A)(4) and DR 2-106(A) were not based on the theory that the accused obtained attorney fees from an estate's assets without a prior court order in violation of ORS 116.183(1), which was the theory advanced by the Bar in the amended complaint and at trial. The trial panel's decisions were instead based on a finding that, at the time the accused obtained certain attorney fees from an estate, he had not earned them.[1]

The trial panel imposed on the accused a nine-month suspension from the practice of law.

The accused petitioned this court for review of (1) the trial panel's decision finding him guilty of violating DR 5-101(A), and (2) the sanction imposed by the trial panel. The Bar filed a brief in response, seeking to have the accused found guilty of violating DR 5-101(A), DR 1-102(A)(4), and DR 2-106(A) as pleaded and seeking an increase in the sanction imposed by the trial panel. The Bar does not seek review of the trial panel's finding of not guilty concerning DR 7-102(A)(8).

---

[1] The Bar and the accused have agreed not to seek affirmance or reversal concerning the trial panel's theory of the accused's guilt with respect to DR 1-102(A)(4) and DR 2-106(A). Instead, the Bar and the accused agree that "[t]he Bar shall be entitled to brief, argue and urge [this] court to find that the Accused violated [those disciplinary rules] under the theory advanced by the Bar in its pleadings and at trial."

We review *de novo*. ORS 9.536(3); Bar Rule of Procedure (BR) 10.6. The Bar has the burden of establishing a disciplinary violation by clear and convincing evidence. BR 5.2; *In re Dinerman*, 314 Or 308, 311, 840 P2d 50 (1992). We find the accused guilty of violating DR 5-101(A), DR 2-106(A), and DR 1-102(A)(4) and suspend him from the practice of law for a period of one year.

The facts set forth below are established by clear and convincing evidence.

On August 31, 1988, the accused executed an unsecured promissory note in favor of Larch Cummins, in which the accused agreed to repay a loan of $30,000 by August 31, 1989, together with interest at 10 percent per annum. The promissory note was the culmination of a series of loans made by Cummins to the accused that commenced in the spring of 1988, all of which were combined into the August 31, 1988, note. Cummins died on October 4, 1988. Cummins's will, which had been prepared by the accused, named two of Cummins's nieces, Wanda Hickson and Elsie Cooley, to serve as personal representatives. In addition to Hickson and Cooley, numerous persons were listed as devisees in Cummins's will. Before his death, Cummins had told Hickson and Cooley to hire the accused as the lawyer for the estate.

On October 10, 1988, Hickson and Cooley met with the accused at Cummins's home. Hickson and Cooley advised the accused that neither had ever served as a personal representative. During that meeting, the accused explained the general nature of the Cummins estate, the duties of the personal representatives, their relationship to the lawyer for the estate, and the duties of a lawyer in probating an estate. The August 31, 1988, promissory note also was discussed at that meeting. The accused told Hickson and Cooley that "it would be hard for him owing money to the estate to also be [the] lawyer [for the estate], but [that] there was no reason why he could not [do so]." The accused also told Hickson and Cooley that there was no reason why he could not pay the note, because it was not due for another 10 months. The accused told Hickson and Cooley that, if they wished, they could consult with another lawyer before hiring him. No writing memorialized the accused's statements to Hickson and Cooley. Without seeking or obtaining advice from

another lawyer, Hickson and Cooley hired the accused to probate the Cummins estate.

On October 12, 1988, in response to a petition submitted by the accused, the Lane County Circuit Court issued an order admitting Cummins's will to probate and appointing Hickson and Cooley as copersonal representatives. On October 13, 1988, less than 48 hours after he was retained, the accused requested $12,500 in fees from the personal representatives, submitting neither a billing nor an accounting to his clients, nor a petition for a partial award of attorney fees to the court. Not knowing that they could be held accountable to the court and the devisees of Cummins's estate, Hickson and Cooley promptly complied with the accused's request and paid him $12,500 from the estate's account.

On December 15, 1988, the accused requested an additional $15,000 in fees from Hickson and Cooley. Again, Hickson and Cooley complied with the accused's request, drawing on funds of the estate, despite the fact that the accused presented no invoice or accounting and filed no petition in the probate court for a partial award of attorney fees. The accused made other similar requests for fees in February, April, June, and July of 1989. By July 1989, Hickson and Cooley had paid the accused $59,000 from funds of the estate.

In August 1989, about two weeks before the due date on the promissory note, the accused asked Hickson and Cooley whether he could defer payment on the note until the estate closed.[2] The accused did not explain why he wanted to defer payment and did not advise Hickson and Cooley to seek independent counsel on that issue. Hickson and Cooley agreed to extend the due date on the promissory note for an indefinite period as long as the note was paid in full with accrued interest before the estate was closed. The terms of that agreement were not reduced to writing. The accused did not apprise Hickson and Cooley, orally or in writing, of the conflict created by the accused's continued status as a debtor in default to and lawyer for the estate.

---

[2] Hickson and Cooley had no idea when the estate would close. On December 29, 1994, an "Order Discharging Personal Representatives and Closing Estate" was entered by the circuit court.

The accused filed the first annual accounting on or about April 13, 1990. After reviewing it, the probate court observed that the accused had received $59,000 from the estate without court approval.[3] The probate court also noticed that the accused had not paid his debt to the estate.

At a show cause hearing, the probate court asked the accused about his debt to the estate and asked why the accused had taken fees from the estate without a court order. As to the debt, the accused advised the probate court that the personal representatives had agreed to extend the note. As to the fees, the accused told the court that the authority for his conduct "was provided so under the will."[4]

The probate court held a second hearing on September 25, 1990. As of that date, the accused had made no payment of principal or interest on the debt, nor had he reimbursed or offered to reimburse the estate for the fees taken.

By February 1991, the accused had made no payments of principal or interest on the note, although he had paid $2,200 from his own funds on behalf of the estate to the Internal Revenue Service. The probate court notified the Bar of the accused's conduct and issued an order prohibiting Hickson and Cooley from spending any more monies of the estate without court approval.

On July 25, 1992, the State Professional Responsibility Board authorized prosecution of the accused regarding the concerns raised by the probate court. In September 1992, after the Bar had instituted disciplinary proceedings, the accused owed the estate about $33,500 on the note. He then borrowed money from his parents and paid in full his debt on the note to the estate.

---

[3] The first annual accounting reflected seven distributions from the estate to the accused: $12,500; $15,000; $7,500; $9,000; $11,000; $3,500; and $1,500. The last distribution of $1,500, tendered on August 23, 1989, was later returned, but no adjustment had been reflected on the first annual accounting.

[4] Article 5 of Cummins's will, which the accused had drafted, states:

"After the payment of debts of my estate, death taxes, and the expenses of administration, including periodic payment of legal and accounting fees during the course of administration, the residue of my estate then remaining shall be divided in equal shares, per capita * * *."

When the disciplinary hearing commenced, the estate remained open, the accused had not filed a petition in the probate court for approval of the personal representatives' partial award of attorney fees to him or repaid to the estate the $59,000 that he had received in fees without court approval, and the accused continued to represent Hickson and Cooley in their capacities as personal representatives of Cummins's estate.

## DR 5-101(A)

DR 5-101(A) provides in part:

"Except with the consent of the lawyer's client after full disclosure, a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

The accused admits that he violated DR 5-101(A), but argues that his only error was in failing to "confirm [his] disclosures and [his clients'] consent in writing." The Bar contends that the accused never made the required disclosures, either orally or in writing.

The concept of "full disclosure" is spelled out in the definitions section of the disciplinary rules. " 'Full disclosure' means an explanation sufficient to apprise the recipient of the potential adverse impact on the recipient, of the matter to which the recipient is asked to consent." DR 10-101(B)(1). " '[F]ull disclosure' shall also include a recommendation that the recipient seek independent legal advice to determine if consent should be given and *shall be contemporaneously confirmed in writing*." DR 10-101(B)(2) (emphasis added).

When the accused was employed, he knew that he owed the Cummins estate a significant amount of money. When the accused undertook to represent Hickson and Cooley in October 1988, he did not contemporaneously confirm any of his disclosures in writing, as required by DR 10-101(B)(2). The accused did not make full disclosure, as required by DR 5-101(A) and DR 10-101(B)(1).

■ If a conflict of interest develops during the course of representation, DR 5-101(A) precludes a lawyer from continuing professional employment, except with the consent of the lawyer's client after full disclosure. *See In re Moore*, 299 Or 496, 507, 703 P2d 961 (1985) (if additional conflicts develop during the course of representation, the full disclosure requirement must be met and consent of the client received). In August 1989, an additional conflict of interest developed during the accused's representation of the estate. At that time, the promissory note was about to become due. The accused asked Hickson and Cooley whether he could defer payment on the note until the estate was closed. The accused made no disclosures whatsoever to the corepresentatives of the estate about the conflict created by the accused's continued status as both a "past due" debtor of the estate and the lawyer for the estate.

■ We conclude by clear and convincing evidence that the accused violated DR 5-101(A) in two separate respects.

## DR 2-106(A)

■ DR 2-106(A) provides that "[a] lawyer shall not enter into an agreement for, charge or *collect* an *illegal* or clearly excessive fee." (Emphasis added.) Illegal conduct, for the purposes of the Code of Professional Responsibility, is not limited to criminal conduct, but includes conduct that is forbidden by statute. *See In re Hockett*, 303 Or 150, 162, 734 P2d 877 (1987) (holding that DR 7-102(A)(7), which prohibits conduct "the lawyer knows to be illegal," forbids "[a]dvising and assisting clients to engage in conduct forbidden by statute").

The accused admits that he received attorney fees from the Cummins estate without prior approval from the probate court, but denies that the law requires prior approval from the probate court. The accused asserts, therefore, that he did not collect an illegal fee within the meaning of DR 2-106(A).

ORS 116.183(1) authorizes the allowance of attorney fees in a probate proceeding:

"A personal representative shall be allowed in the settlement of the final account all necessary expenses incurred in the care, management and settlement of the estate, including

reasonable fees of appraisers, attorneys and other qualified persons employed by the personal representative. A partial award of such expenses, including fees, may be allowed prior to settlement of the final account upon petition, showing that the final account reasonably cannot be filed at that time, and upon notice as directed by the court. An award of reasonable attorney fees under this section shall be made after consideration of the customary fees in the community for similar services, the time spent by counsel, counsel's experience in such matters, the skill displayed by counsel, the excellence of the result obtained, any agreement as to fees which may exist between the personal representative and the counsel of the personal representative, the amount of responsibility assumed by counsel considering the total value of the estate, and such other factors as may be relevant. No single factor shall be controlling."

In *In re Snyder*, 276 Or 897, 559 P2d 1273 (1976), this court discussed the propriety of a lawyer receiving attorney fees from an estate without a prior court order. Snyder was both the lawyer for and the personal representative of an estate. The final account revealed that, during the administration of the estate, Snyder had taken $5,200 in fees from the estate without obtaining prior court approval. The successor personal representative objected, among other things, to the amount claimed by Snyder for his fees as personal representative and lawyer. A trial court ordered repayment of a portion of those fees. On review, this court stated that "we do not approve of payment of attorney fees without a court order." *Id.* at 904. Although Snyder was not charged by the Bar with collecting an illegal fee, the *Snyder* decision put lawyers on notice that it was improper for a lawyer to accept attorney fees from estate assets without a prior court order.

In *In re Coe*, 302 Or 553, 561, 731 P2d 1028 (1987), Coe, acting as the personal representative for an estate and without court authorization, drew two checks payable to himself on estate funds as payment of attorney fees. In reviewing Coe's conduct, this court observed that, although ORS 116.183(1) did not "specifically state that it is the probate court whose 'consideration' is required," it is that court, which by statute has the authority to make the allowance, that must consider the factors stated in the statute before awarding attorney fees to the estate lawyer. *Id.*, at 561-62.

■ Since *Coe*, this court has held that estate lawyers who take attorney fees from an estate without obtaining prior court approval engage in unethical conduct. *See In re Devers*, 317 Or 261, 266, 855 P2d 617 (1993) (lawyer licensed to practice law in both Oregon and Michigan who, while representing a personal representative in Michigan, collected a $2,775 fee from the heirs but did not disclose the fee to the probate court, violated DR 2-106(A)); *In re Phelps*, 306 Or 508, 517, 760 P2d 1331 (1988) (lawyer disbarred for, *inter alia*, retaining attorney fees "although he had not obtained authorization from the court as required by ORS 116.183-(1)"); *In re Weidner*, 320 Or 336, 338-39, 341, 883 P2d 1293 (1994) (lawyer violated DR 2-106(A) when he collected attorney fees from an estate without applying to the probate court or obtaining an order from that court as required by ORS 116.183).[5] The rule to be derived from those cases is that it is impermissible to collect attorney fees from an estate in probate without prior court approval. Any such attorney fee that is collected without approval is unlawful and, hence, an "illegal" fee. Therefore, the accused's receipt of the attorney fees without court approval in this case was the collection of an illegal fee and was unethical conduct under DR 2-106(A).[6]

The accused also seeks to excuse his collection of attorney fees from the estate's assets without prior court approval by claiming that he was not aware that such approval was required by law. This court rejected a similar claim of ignorance in *Weidner*, 320 Or at 340-41, and we reject it here as well.

---

[5] *Coe, Phelps*, and *Weidner* all contained the additional charge of theft, a charge not present here. However, as noted in *In re Coe*, 302 Or 553, 566, 731 P2d 1028 (1987), "[i]t is of no consequence that [Coe] may have actually earned a part of the fees prior to the unauthorized payment." The issue is whether the payment of the attorney fees was authorized, not whether the lawyer had earned the fees at the time when the lawyer obtained them from an estate.

[6] Oregon Formal Ethics Opinion No. 1991-63, approved by the Board of Governors, July 1991, states:

"Legal fees and personal representative fees must be approved by order of court before they can be paid. ORS 116.183. It follows that Attorney may receive an interim payment if, but only if, an appropriate court order is first entered. *Cf.* DR 2-106(A)[.]"

We conclude that the Bar has established by clear and convincing evidence that the accused violated DR 2-106(A) when he collected attorney fees from the Cummins estate without first obtaining an order from the probate court as required by ORS 116.183.

## DR 1-102(A)(4)

■ DR 1-102(A)(4) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct that is prejudicial to the administration of justice." A lawyer violates DR 1-102(A)(4) when the lawyer engages in conduct during the course of a judicial proceeding and the conduct causes or has the potential to cause harm or injury to either the procedural functioning of that proceeding or the substantive interest of a party to that proceeding. *In re Haws*, 310 Or 741, 745-48, 801 P2d 818 (1990).

The Oregon legislature has conferred on probate courts a wide range of functions and responsibilities in overseeing the probate process, including the appointment and qualification of personal representatives, the administration, settlement, and distribution of estates of decedents, the construction of wills, and the supervision and discipline of personal representatives. ORS 111.085(1), (5), (6), and (8). Throughout the administrative process, probate courts retain jurisdiction over the decedent's property.

■ From October 1988 through July 1989, the accused caused $59,000 in assets of the estate to be distributed to himself without obtaining an order from the court that was charged with overseeing the probate of the estate as required by ORS 116.183(1). The accused's failure to apply to the probate court for an award of attorney fees also deprived the devisees and other interested parties of the notice of an attorney fee application to which they were entitled under UTCR 9.090(4).[7] The accused's conduct caused harm to the procedural functioning of the administration of the Cummins estate and violated DR 1-102(A)(4). *See In re White*, 311 Or 573, 583-84, 815 P2d 1257 (1991) (lawyer engaged in conduct prejudicial to the administration of justice and violated DR

---

[7] UTCR 9.090(4) provides that "[a]ll attorney fee applications and accountings in estates, guardianships and conservatorships must be served in the manner and on the persons described in ORS 116.093, ORS 126.283 and acts amendatory thereof."

1-102(A)(4) by filing repetitious claims, filing claims in different counties when that was not warranted, failing to change venue, failing to appear at hearings, and failing to prosecute cases); *Haws*, 310 Or at 748 (stating that a repeated pattern of conduct that caused some harm to the administration of justice would violate DR 1-102(A)(4)).

We conclude that the Bar has established by clear and convincing evidence that the accused violated DR 1-102(A)(4).

## SANCTIONS

We are guided by the ABA *Model Standards for Imposing Lawyer Sanctions* (1991) (ABA Standards) in determining the appropriate sanction. *See, e.g., Weidner*, 320 Or at 350 (using ABA Standards for guidance). Using those standards, we ask four questions in ascertaining an appropriate sanction:

(1) What is the nature of the ethical duty violated?

(2) What was the lawyer's mental state at the time of the violation?

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?

(4) Are there any aggravating or mitigating circumstances? ABA Standard 3.0.

We answer each of those four questions in turn to determine the appropriate sanction for the accused's misconduct.

First, the accused's misconduct violated the duties of loyalty, diligence, competence, and candor that he owed to his clients. It also violated ethical duties owed to the legal system. Lawyers must abide by the statutory and procedural rules that shape the administration of justice. The accused's misconduct violated both a statute (ORS 116.183(1)) and a uniform trial court rule (UTCR 9.090(4)).

Second, as to the accused's mental state, we conclude that the accused acted intentionally when he failed to comply with the full disclosure and consent requirements of DR 5-101(A). We have rejected his claim of ignorance about the

requirement in ORS 116.183(1) concerning prior court approval of an award of attorney fees from estate assets. The accused acted intentionally by causing the withdrawal of assets of the estate for the payment of his attorney fees without prior approval of the probate court.

Third, although the accused's failure to comply with the full disclosure and consent requirements of DR 5-101(A) caused no actual injury, the accused's failure to disclose his conflict created the potential for serious injury. That potential lasted until the accused's debt to the Cummins estate eventually was paid some four years after the accused was retained and three years after his unsecured promissory note first became due.

A further potential injury to personal representatives Hickson and Cooley existed as a result of the accused's collection of $59,000 in attorney fees without prior court approval. At no time did the accused advise Hickson and Cooley of either the requirements in ORS 116.183(1) for the interim payment of attorney fees or the fact that, if the probate court disallowed his fees, they, as the personal representatives, might be liable to the estate for the $59,000 advanced[8] or that they might receive less compensation as personal representatives due to the attorney fees withdrawn. Moreover, the accused's misconduct put Hickson and Cooley at risk of violating their responsibility to the beneficiaries of the Cummins estate and to the probate court.

Lastly, the only mitigating factor we find applicable is the absence of a prior disciplinary record. ABA Standard 9.32(a).

There are several aggravating factors, however. The accused was untruthful to the probate court, to the Bar in responding to the probate court's concerns, and to the trial panel itself. ABA Standard 9.22(f). In September 1990, and again in March 1991, after the probate court had advised the Bar of the accused's conduct, the accused, in an attempt to

---

[8] ORS 116.123 provides:

"The court may disapprove the [final] account in whole or in part, surcharge the personal representative for any loss caused by any breach of duty and deny in whole or in part the right of the personal representative to receive compensation."

reassure the probate court, told that court that Hickson and Cooley had obtained independent counsel with respect to the renegotiation of the promissory note. Both Hickson and Cooley testified that they never sought independent counsel for any aspect of their dealings with the Cummins estate and never told the accused otherwise. The trial panel did not believe the accused when he testified that he thought that was what Hickson and Cooley told him, and neither do we.

On June 17, 1991, the accused prepared a statement for Hickson and Cooley to submit to the Bar that stated that the accused's status as debtor to and lawyer for the Cummins estate, "as well as other matters involving the estate, have been discussed with independent legal counsel." Cooley later testified that the accused prepared the statement and that she relied on him to make sure that it was accurate. Cooley testified that she never told the accused that she had sought independent legal counsel and that she thought that the accused himself was the independent legal counsel referred to in the affidavit. Hickson testified similarly. We believe their testimony.

The June 1991 statement prepared by the accused, signed by Hickson and Cooley and submitted to the Bar, contained another falsehood. It stated that "[p]ayments against said [n]ote are being received by the estate." At the time that Hickson and Cooley signed that statement, the accused had made only one payment (using his own funds), in January 1991, of $2,200 to the IRS to cover taxes owed by the estate. That single payment was credited to the accused's obligation on the promissory note, but there had been no "payments," as alleged in the statement.

In a September 3, 1991, letter to the Bar's disciplinary counsel staff, the accused discussed the repayment arrangement on the promissory note:

"In January, 1991, the Co-Personal Representatives and I reached a firm agreement and understanding about how best to determine and calculate interest (we would have an independent accountant do that for us), and that payment of principle and interest would be made in full prior to the close of the estate, whenever that closure might occur. In the interim periodic payments would be made on the Note. *Independent counsel was consulted with by the Co-Personal*

*Representatives prior to our arriving at this January under-standing.*" (Emphasis added.)

As previously stated, at no time did Hickson or Cooley confer with independent counsel, nor did they inform the accused that they had.

Other aggravating factors include selfish motive, indifference to making restitution, substantial experience in estate practice, and two separate failures to make full written disclosure of an actual conflict of interest. ABA Standard 9.22(b), (c), (i), and (j).

In *In re Boyer*, 295 Or 624, 669 P2d 326 (1983), this court reviewed 21 cases concerning conflicts of interest, all decided by this court in the preceding seven years, to determine the appropriate sanction for a lawyer who had arranged a loan between two separate but current clients without full disclosure to either. In imposing a seven-month suspension, this court said:

> "Since the purpose of sanctions is to protect the public, and the punishment of the lawyer only incidental thereto, we believe seven months suspension to be adequate in all of the circumstances here presented. We note, however, that this particular type of unethical conduct appears to be on the rise. Deterrence thereof for the public good may be accomplished by more severe penalties for this kind of unprofessional conduct which may occur after the date this opinion is published." *Id.* at 630.

Two years later, in *In re O'Byrne*, 298 Or 535, 551, 694 P2d 955 (1985), this court observed that, in previous conflict of interest cases under DR 5-101(A), it had

> "drawn a line between cases in which the lawyer is guilty of only a conflict of interest and cases in which the conflict has been aggravated by fraud, dishonesty or misappropriation of funds. In the former class of cases, the sanctions have been a public reprimand or a suspension for less than one year. In the latter class of cases, the suspensions have exceeded one year and in one case, permanent disbarment was ordered."

*O'Byrne* involved the loan of money from clients "experienced in the business world" to a lawyer who failed to explain the pitfalls of the business relationship or advise the clients to obtain independent advice. *Id.* at 546, 548. The evidence revealed no fraud or dishonesty on the part of the lawyer, and

the lawyer did not commingle funds or use them for an unauthorized purpose. *Id.* at 551. The lawyer was suspended for four months.

In *Moore*, 299 Or at 508, 510, this court suspended a lawyer for one year when the lawyer represented multiple clients and borrowed money from those clients without fully disclosing the nature of the conflict of interest between them. Although the court did not find the lawyer guilty of fraud or dishonesty, other aggravating factors supported the sanction. *Id.*

In light of the ABA Standards and this court's precedents, as well as the significance of the accused's acts, we conclude that a one-year suspension is an appropriate sanction for the accused's misconduct in this case.

The accused is suspended from the practice of law for a period of one year commencing on the effective date of this decision.