Argued and submitted April 30, 1997, accused suspended from the practice of law for two years April 9, 1998

## In re Complaint as to the Conduct of

## DAVID W. STAUFFER,
*Accused.*

## (OSB 93-63; SC S43698)

956 P2d 967

David W. Stauffer, Portland, argued the cause and filed the briefs *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar.

Before Carson, Chief Justice, Gillette, Van Hoomissen, Durham, and Kulongoski, Justices.*

PER CURIAM

---

\* Fadeley, J., retired January 31, 1998, and did not participate in this decision. Graber J., resigned March 31, 1998, and did not participate in this decision.

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charges that the accused violated Code of Professional Responsibility Disciplinary Rules (DR) 1-102-(A)(4) (conduct prejudicial to administration of justice), DR 5-105(C) (former client conflicts of interest), DR 5-101(A) (lawyer's self-interest conflict of interest), DR 2-106(A) (charging clearly excessive fee), and DR 7-102(A)(2) (knowingly advancing claim unwarranted under existing law).[1] A trial panel of the Disciplinary Board found that the accused had violated DR 1-102(A)(4), DR 5-105(C), DR 5-101(A), and DR 2-106(A), but not DR 7-102(A)(2), and imposed a 120-day suspension. The matter comes before us pursuant to ORS 9.536(2) and Bar Rules of Procedure (BR) 10.1 and 10.4.

On review, the accused seeks the reversal of all findings of ethical violations. The Bar contends that the trial panel erred in finding that the accused did not violate DR 7-102(A)(2) and recommends at least a one-year suspension. This court reviews the trial panel's decision *de novo*. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing misconduct by clear and convincing evidence. ORS 9.536(2); BR 5.2. For the reasons that follow, we conclude that the accused violated DR 1-102(A)(4), DR 5-105(C), DR 5-101(A), DR 2-106(A), and DR 7-102(A)(2). We further conclude that the appropriate sanction is a two-year suspension.

## I. FINDINGS OF FACT

We find the following facts. In 1986, John Smith, the sole owner of an insurance agency, Corbett-Smith, Inc. (CSI), died intestate. CSI became the major asset of his probate estate (the Estate). The Estate's remaining assets consisted of personal property valued at $10,000, two jointly held cars valued at $5,000, and a one-half interest (net value $17,000) in a house owned as tenant in common with Esther Smith

---

[1] The Bar also charged the accused with violations of DR 7-104(A)(1) (communicating with person represented by counsel) and DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation). The trial panel concluded that the Bar had failed to prove those charges by clear and convincing evidence and dismissed them. The Bar does not ask us to review those charges and we, therefore, elect not to consider them.

(Smith), John Smith's widow. In July 1987, the original inventory valued the total Estate at $132,000. Smith, the sole beneficiary of the Estate, was appointed personal representative of the Estate. Smith was 61 years old when her husband died. Lawyer Clayton Morrison represented Smith as personal representative.

Initially, the Oregon Bank filed the only claim against the Estate, in the amount of $9,291.33. Because of insufficient cash in the Estate, that claim was not discharged immediately.

In March 1987, Smith, in her capacity as personal representative of the Estate, sold CSI's business assets to Roger and Joyce Atkins (the Atkinses) on contract for $5,000 down and monthly payments of $1,600 for four years. The Estate retained ownership of CSI's stock. Morrison represented Smith as personal representative in the sale. After making one payment, the Atkinses defaulted on the contract.

In August 1987, Smith executed a written retainer agreement with the accused to represent her personally in connection with "[d]isputes with Roger and Joyce Atkins, under the AGREEMENT FOR SALE AND PURCHASE OF BUSINESS ASSETS OF CORBETT-SMITH, INC., * * * dated March 6, 1987." Smith agreed to pay the accused $100 per hour and to pay him at least $150 monthly. Smith paid the accused $1,000 toward his retainer at that time. The retainer agreement specifically stated that "[Smith] is personally responsible for the payment of fees and costs incurred." The accused billed her each month for his services. Over the course of several years, Smith paid the accused about $6,000 under the 1987 retainer agreement. In September 1987, the accused informed the Atkinses by letter that Smith had retained him to represent her in the contract dispute.

Smith and the accused thereafter orally agreed that he also would represent her in her capacity as personal representative of the Estate. *See In re Phelps*, 306 Or 508, 517, 760 P2d 1331 (1988) (the personal representative, not the estate or beneficiary, is the client). The accused did not advise Smith about any actual or likely conflict of interest in his representing her personally and in representing her as

personal representative of the Estate, nor did Smith consent to any actual or likely conflict of interest.[2]

In September 1987, the accused filed a complaint on behalf of the Estate and CSI against the Atkinses for breach of contract. The accused did not seek to have a receiver appointed to protect the Estate's and CSI's interests in CSI's business assets.

In November 1987, Smith resigned as personal representative of the Estate and George Birnie was appointed in her place.[3] The accused billed Smith personally for an outstanding balance of $1,494 in November 1987, $2,499 in December 1987, and $4,589 in January 1988.

By May 1988, Smith was behind in her monthly payments to the accused. The accused told Smith that he needed money to bring the Atkins case to trial. When Smith tried to borrow against the house, the bank refused, because the Estate owned a one-half interest in the property and, therefore, Smith did not have clear title. Smith then asked the accused to transfer the Estate's interest in the house to her so that she could refinance it and use the proceeds to pay his attorney fees and to finance the upcoming Atkins litigation. The accused checked with Birnie and then prepared a personal representative's deed conveying the Estate's interest to Smith, which Birnie signed.[4] Neither Birnie nor the accused

---

[2] The mere fact that a theoretical conflict of interest exists that may develop into an actual conflict at some later date is not sufficient for the disclosure and consent requirements of DR 5-105. *See In re Samuels/Weiner*, 296 Or 224, 230, 674 P2d 1166 (1983) (at time accused represented clients, no evidence suggested either an existing conflict of interest or that accuseds' independent professional judgment was or likely would be adversely affected by the employment).

[3] "A personal representative is a fiduciary who is under a general duty to and shall collect the income from property of the estate in the possession of the personal representative and preserve, settle and distribute the estate in accordance with the terms of the will and ORS chapters 111 [to] 117 as expeditiously and with as little sacrifice of value as is reasonable under the circumstances." ORS 114.265. The representative's personal interest in the estate is limited to receipt of a statutorily authorized fee based on the value of the estate. ORS 116.173.

[4] Birnie apparently believed that the Smiths had owned the house jointly with rights of survivorship and that the interest in the house, therefore, had been included in the Estate's initial inventory by mistake. In fact, the Smiths had purchased the house together before they were married, and the deed to them created a tenancy in common with no right of survivorship. Accordingly, the probate inventory correctly included a half-interest in the house as part of the Estate.

obtained the probate court's approval for that transfer to Smith.[5] Birnie's 1988, 1989, and 1990 interim accountings to the probate court did not disclose the transfer. The accused billed Smith personally for preparing and recording the deed. The accused requested by letter that Smith send him $1,000 "to cover trial costs." He reminded her that she was seven months behind on her retainer agreement payments, adding "I am confident that, as you have told me, your recent re-financing of your house will provide you with adequate funds to make the above payments." Smith then refinanced the house and paid the accused $1,400. The accused continued to represent Smith personally, as well as representing the personal representative and CSI.

Also, in May 1988, the accused wrote to Smith advising her that there was a probability that the Atkins claim could be settled. He suggested that Smith should try to create a "settlement offer" in which the Atkinses would give CSI's business assets back to the Estate and also pay an additional sum of money to Smith, "such as the cost of [her] attorney fees." In October 1988, the accused billed Smith personally for $24,614.

In October 1988, the accused advised Smith of a tentative settlement offer from the Atkinses. Smith rejected the offer. In a letter confirming their discussion, the accused acknowledged that Smith was the president of CSI.

The breach of contract case was tried in December 1988. A jury returned a verdict for CSI, awarding CSI $50,000 in actual damages, less $10,444.53 on the Atkinses' counterclaim, and judgment was entered against the Atkinses accordingly. The Atkins contract provided for an award of attorney fees to the prevailing party, and the accused claimed $47,820. In his affidavit on attorney fees, the accused stated that "plaintiffs" Smith, as personal representative of the Estate, and CSI, had "entered into a written contract with me and agreed to pay $100 per hour for my attorney services." The written contract in the record refers only to Smith, but does not identify her as personal representative for the

---

[5] *See* ORS 116.013 (authorizing personal representative with approval of probate court to make partial distribution of estate property).

Estate or as president of CSI. Early in January 1989, the accused billed Smith personally for $44,134.14. In large measure, this billing was duplicative of the attorney fees that the accused had claimed in the Atkins litigation on behalf of the Estate and CSI.

On January 24, 1989, the Atkinses filed a petition for Chapter 7 bankruptcy. On January 28, 1989, the trial court in the Atkins breach of contract case entered an amended judgment awarding the Estate and CSI attorneys fees of $25,000. Representing the bankruptcy trustee in the Atkins bankruptcy case, the accused claimed, unsuccessfully, that the Atkinses had made a preferential transfer of about $33,000 to their lawyers.[6]

In February 1989, Smith retained lawyer Marvin Nepom, on a contingent fee basis, to file a legal malpractice claim against Morrison, claiming that Morrison had prepared the contract for the sale of CSI's business assets to the Atkinses negligently. Smith's claim asserted that Morrison had failed to advise and provide CSI with appropriate security interests in CSI's business assets or to advise and provide for the appointment of a receiver in the event that the Atkinses defaulted on the contract. At that time, Morrison's lawyer raised with the Professional Liability Fund (PLF) the possibility that the accused also may have been negligent, because as lawyer for the personal representative, the accused had not sought to have a receiver appointed when the Atkinses first defaulted on the contract and when their lawyer suggested that they might file for bankruptcy, thereby allowing the Atkinses to run CSI into the ground so that there was no money remaining to pay CSI's judgment against them.

The accused asked Nepom to include his attorney fees as part of the claim against Morrison. In August 1989, in response to Nepom's request, the accused contended in writing that Smith owed him $48,000 for his services in the Atkins case. The accused added that, in his opinion, Smith "would probably not have incurred my attorney fees if the

---

[6] The Estate's and CSI's judgment against the Atkinses, including the attorney fees award, ultimately was discharged in bankruptcy in November 1991.

contract had been properly drafted [by Morrison]." The accused also advised Nepom that he was going to start imposing a 1.5% monthly interest charge on the amount that he claimed Smith owed him. That same day, the accused notified Smith personally, Smith as president of CSI, and Birnie, as personal representative of the Estate, that he intended to start charging interest on the attorney fees that he claimed were due him from Smith personally, and from the Estate, and from CSI. That was the first time that the accused sought to charge the Estate and CSI for his services. Before that time, he had billed only Smith personally for his attorney fees. Meanwhile, the Estate remained open.

In August 1990, the PLF settled the malpractice claim against Morrison for $39,000. Although the accused was not named as a party in the Morrison malpractice claim, the PLF insisted that the settlement include any potential malpractice claim that Smith, the personal representative, or CSI might have against the accused. However, Nepom preserved Smith's right to assert the accused's alleged malpractice in the Atkins case as an affirmative defense to any claim that the accused might bring against her personally to recover attorney fees. Birnie approved the Morrison settlement for the Estate and Smith approved it for herself. Nepom kept $9,649.71 as his contingent fee and $401.15 as costs, paid Birnie, as personal representative, $1,500, and gave the balance, $27,449.14, to Smith. Neither the Morrison settlement, nor the formula for its distribution, was submitted to the probate court for approval by Birnie or by the accused. At the disciplinary hearing, the Bar's expert witness suggested that the accused may have acquiesced in the distribution of more than $27,000 to Smith, because Smith then would have been able to pay the accused's attorney fees from the Atkins litigation. Had that money been paid to the Estate, the accused would have had to petition the probate court for approval of the payment of his attorney fees. At that time, the accused was looking only to Smith to pay his attorney fees and Nepom's payment to Smith would have enabled her to pay the accused immediately.

In September 1990, the accused wrote to Smith, telling her that she now owed him $57,360 ($48,000 in attorney fees and $9,360 in interest). He suggested that Smith should

sell her house to him, retaining a life estate for herself. In his letter, the accused explained to Smith that he was not writing in his capacity as her lawyer, but was negotiating with her about his attorney fee claim. He recommended that she retain independent legal counsel. On Smith's behalf, Nepom "unequivocally denied" the accused's claim, notifying him that Smith would assert his alleged malpractice in the Atkins case as a defense to his claim. Nepom also warned the accused that, if he sued Smith for attorney fees, Nepom would ask for sanctions and attorney fees against the accused. The accused responded to Nepom by letter that he resigned as Smith's lawyer and that Smith then owed him $60,700.70. The accused continued to represent the personal representative and CSI, billing them in excess of $20,000 thereafter for additional attorney fees.

The Bar's complaint in this case does not charge the accused with any ethical violation *before* October 1990.

In October 1990, the accused filed a $60,700.70 claim against the Estate. His claim included his attorney fees for the Atkins litigation, plus about $10,000 in accrued interest. The accused informed Birnie that the accused should be listed as a creditor of the Estate, that he had incurred $60,700.70 in fees in the course of representing the Estate, and that, "[I]f any assets have been distributed to any beneficiaries [*i.e.*, to Smith], I shall seek the return of those assets to the Estate." That same month, the accused wrote to Nepom demanding that Smith "immediately pay the entire balance of the account, $60,700.70." The amount that the accused was claiming from the Estate was duplicative of the amount that he also was claiming from Smith. In June 1991, the accused billed Smith for $67,801.70, which included $16,640.01 in interest.

In June 1991, Smith, represented by lawyer Thomas Renn, filed a Chapter 7 bankruptcy petition. Smith's petition recited that the accused had an unsecured claim for $70,000 against her, but that she disputed his claim. The accused represented himself, the personal representative, and CSI in Smith's bankruptcy proceedings. In September 1991, the accused, representing himself, submitted claims asserting that Smith owed him $67,801.70 for legal services performed

from 1987 through 1990 and that Smith owed the Estate $44,000 (apparently the $27,000 the accused believed Smith owed from the Morrison settlement and the $17,000 net value of the Estate's interest in the house that had been transferred to her). In an affidavit submitted to the bankruptcy court, the accused stated: "I believe I will be first in line to receive any money that those entities [*i.e.*, the Estate and CSI] might receive from any legal actions that result in the collection of money by those entities."

During the next eighteen months, the accused aggressively pursued his attorney fees claim against Smith in the bankruptcy proceedings by asserting that she had failed to declare, or had improperly transferred, assets. Specifically, in August 1991, and on subsequent occasions, the accused informed the bankruptcy trustee about certain of Smith's assets (including jewelry, vehicles, personal property, and settlement proceeds) of which he had become aware during the course of his representing her:

> "[D]ebtor [Smith] told me, several times, that she owned jewelry worth $100,000. Also, during our long relationship, I observed such jewelry on several occasions. Much of it had great sentimental value to the debtor * * *."

The accused stated that he intended to purchase everything that Smith owned, including her house, and that her jewelry should be made available to satisfy his attorney fees claim against Smith.

In September 1991, the bankruptcy trustee decided to recommend that Smith's case be considered a "no asset" case and that she should receive a discharge. When the trustee informed the accused of his proposed recommendation to the bankruptcy court and asked him, in his capacity as lawyer for the personal representative of the Estate, to verify that no distribution of Estate proceeds was expected, the accused responded that the Estate could expect to receive $14,000 from the Atkinses bankruptcy proceedings within 180 days due to his appeal of the "preferential transfer" ruling in the Atkinses bankruptcy. As noted, the accused's challenge to that ruling later was unsuccessful. The accused made that response to the bankruptcy trustee in order to prevent Smith from discharging his attorney fees claim against

her. The bankruptcy trustee, however, declined to approve the accused's claim against Smith. The accused then moved to have the trustee removed. In response to the accused's motion, the trustee resigned.

In October 1991, the bankruptcy court appointed a successor trustee. The accused immediately informed the successor trustee of Smith's alleged undisclosed assets. The accused again offered to purchase Smith's house in an effort to compel the sale of the house to pay his attorney fees claim against her.

In November 1991, Renn, Smith's bankruptcy lawyer, wrote to the accused directing him "to immediately stop your harassment of Mrs. Smith." In response, the accused wrote to the bankruptcy trustee, accusing Renn of libeling him and demanding a written retraction and an apology.

In December 1991, Smith dissolved CSI as an Oregon corporation.

In April 1992, the accused, on behalf of the personal representative and CSI, made a claim on the PLF for $39,000 for Nepom's alleged negligence in distributing part of the proceeds of the Morrison settlement to Smith without court approval. He argued that the funds should have been paid to the Estate or to CSI, so that the Estate's creditors, of which he was the largest, could be paid. The PLF responded, expressing puzzlement at the accused's role as lawyer for the personal representative in making a claim against Nepom while he was both another claimant against the Estate and also represented the Oregon Bank, another claimant against the Estate. "That seems like an appearance of conflict at the very least," the PLF advised the accused.

In May 1992, the accused wrote to Smith's bankruptcy lawyer and informed him that he intended to bid high enough for Smith's house that the bankruptcy trustee would be required to sell it. Meanwhile, the accused continued to represent the personal representative and CSI. The accused continued to claim that the Estate and CSI owed him the same attorney fees that he also was claiming from Smith. The annual accounting filed with the probate court in July 1992 showed that the accused was claiming $60,700 from the

Estate for "legal services rendered to this estate and to * * * Smith in her original capacity in Executrix of this decedent's will."

In July 1992, Birnie resigned as personal representative and Mark Humphrey was appointed personal representative. The accused thereafter represented Humphrey as personal representative. The accused did not inform Smith of Birnie's resignation or of Humphrey's appointment.

In September 1992, responding to the claim against Nepom, the PLF asserted that the accused had a conflict of interest in continuing to represent the Estate and CSI while at the same time "continu[ing] to hound [Smith] in her bankruptcy." The PLF also noted the accused's personal interest in the outcome of the malpractice claim against Nepom, the fact that the accused was using the probate as a vehicle to collect the attorney fees that he was claiming from Smith personally, and what the PLF characterized as the accused's "grossly excessive" attorney fees claim billed to the Estate.

In September 1992, Smith complained to the Bar about the accused's conduct. In October 1992, the accused complained to the Bar about the conduct of Smith's bankruptcy lawyer.

Also in October 1992, the PLF settled the malpractice claim against Nepom for $10,000. As a condition of the settlement, the PLF required that an authorized representative of CSI execute the settlement document. By that time, however, Smith had dissolved CSI as an Oregon corporation and CSI had ceased any active business operations. Therefore, the accused met with Humphrey to discuss the Nepom settlement conditions. They concluded that the Estate owned CSI. The accused and Humphrey characterized their meeting as a shareholders' meeting wherein Humphrey appointed the accused as president of CSI for the sole purpose of executing the Nepom settlement document. The accused then agreed to the Nepom settlement on behalf of CSI. The accused received $3,333.33 as his attorney fees for handling the settlement (pursuant to a separate contingency fee agreement with Humphrey), and the balance of the Nepom settlement was deposited in the Estate's trust account. Meanwhile, at the accused's urging, the bankruptcy trustee decided that

Smith's house should be sold for the benefit of her creditors. Faced with a forced sale of her home, Smith dismissed her Chapter 7 bankruptcy case and filed in Chapter 13.

The accused immediately objected to Smith's Chapter 13 petition, arguing that Smith had understated her debts in order to qualify under the Chapter 13 jurisdictional limit (at that time, less than $100,000 in noncontingent, unsecured liquidated debt). To bolster his assertion that Smith had more than the approximate $46,000 debt that she claimed in her petition, the accused filed proofs of claim on behalf of the personal representative and CSI, asserting that Smith owed them $27,000 and $44,000, respectively. Those claims were duplicative, in that they each included the amount that Nepom had paid Smith from the Morrison settlement. That claimed debt pushed Smith over the $100,000 jurisdictional limit and disqualified her from Chapter 13 bankruptcy. In late 1992 or early 1993, Smith voluntarily dismissed her Chapter 13 bankruptcy proceeding.

In December 1992, Smith, represented personally by lawyer Ferris Boothe, moved the probate court to discharge Humphrey and to appoint her as personal representative of the Estate. The accused opposed that motion, arguing that Smith had a conflict of interest.[7] In the alternative, the accused argued that, if Smith were appointed personal representative, she should be required to post a $100,000 bond.

In February 1993, the accused submitted his attorney fees claim to Humphrey, asserting that the Estate and CSI owed him $101,968.23. Of that amount, $81,672.32 represented attorney fees for the Atkins litigation and interest thereon, an amount for which, according to the accused, Smith personally was "jointly and severally liable." The remaining $20,295.91 consisted of attorney fees for the accused's efforts in pursuing his own creditor's claim against Smith in her bankruptcy case, in responding to the Bar's inquiries about Smith's ethical complaints against him, and in complaining to the Bar about Renn, Smith's bankruptcy lawyer. Humphrey approved the accused's claimed attorney

---

[7] The accused argued that Smith was unlikely to seek the return of the $27,000 that Nepom had paid her from the Morrison settlement or the half-interest in the house that Birnie had conveyed to her with the assistance of the accused.

fees in full. Humphrey testified later that, essentially, he merely checked the accused's arithmetic and the particularity of the billing summaries; otherwise, he did not question the claim.

In February 1993, the accused billed Smith for $81,672 "for the successful attorney work I did for her, as of February 4, 1993." The accused demanded that Smith return to the Estate the one-half interest in the house that the personal representative previously had transferred to her (at the accused's direction) and the $27,000 in Morrison settlement funds that Smith had received from Nepom.

In the probate court, the accused asserted that the Estate's interest in the house had been transferred to Smith improperly, was being held by her improperly, and should be returned to the Estate. In May 1993, the accused's demands for return of the house and Smith's motion to discharge Humphrey as personal representative were settled by agreement of the parties. Humphrey's May 1993 final accounting valued the Estate's total assets at $72,619.

Aaron Reuland replaced Humphrey as personal representative, and Richard Perry was named as the lawyer for the personal representative.[8] In exchange for that substitution, Smith reconveyed a one-half interest in the house to the Estate.[9] The accused resigned as lawyer for the personal representative and CSI in March 1993.

In May 1993, Reuland disallowed the accused's claim for attorney fees, which Humphrey previously had approved, on the grounds that the attorney fees were excessive and had improperly billed the Estate for time that the accused had devoted to his personal claims.[10]

---

[8] Lawyer Perry represented Smith personally in her fee dispute with the accused. In June 1994, Perry resigned as lawyer for personal representative Reuland, because of an actual conflict that had arisen between Reuland and Smith.

[9] The accused received $3,452.50 from the Estate in the settlement, which purportedly represented his one-third contingency fee pursuant to a contract with the Estate for the recovery of the Estate's interest in the house. We find no evidence in the record that any such contingency contract ever existed.

[10] See *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 843 P2d 442 (1992) (breach of fiduciary duty owed to client may result in reduction or loss of attorney fees).

In August 1993, the accused moved the probate court to order Reuland to show cause why the accused's claimed attorney fees should not be approved. At a hearing on that motion, the probate court heard testimony from Birnie, Humphrey, Reuland, Nepom, Smith, and the accused. The court ruled that the accused was entitled to receive no more than the amount that he already had received (about $6,000 previously paid by Smith and the $3,333 contingent fee from the Nepom settlement). The court specifically noted that a large portion of the accused's attorney fees claim against the Estate was related to his efforts to recover attorney fees from Smith personally. The accused's appeal from the probate court's ruling was dismissed as having been taken improperly from a nonfinal judgment. *Stauffer v. Reuland*, (A82222), *appeal dismissed by order* October 28, 1994.

In April 1994, Smith made a claim on the Estate, in the amount of $50,062.76, for her contribution to the maintenance of the house (one-half of which was now an Estate asset), as well as other expenses related to the Estate. Reuland allowed that claim to the extent of Estate assets, $6,504.87 (the net proceeds from the Nepom settlement), leaving a balance of $43,557.89 owing to Smith. Reuland thereafter withdrew as personal representative, and Richard Uffelman was appointed as the Estate's fifth personal representative and lawyer Richard Perry was appointed as lawyer for the personal representative.

In August 1994, the house was sold, to the Estate's net benefit of about $4,000. As of July 1996, the date of the disciplinary hearing herein, the probate of the Estate was still open, due largely to tax complications resulting from the fact that, in the years that the probate had remained open, the property had appreciated significantly in value from the stepped-up tax basis that it had acquired at Mr. Smith's death. In October 1995, personal representative Uffelman filed his final account and petitioned for summary closure of the Estate, reporting to the probate court that the Estate was "insolvent."

We proceed to consider the disciplinary rules that the accused was charged with violating.

## III. APPLICATION OF THE DISCIPLINARY RULES

A. DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"\* \* \* \* \*

"(4) Engage in conduct that is prejudicial to the administration of justice[.]"

The term "conduct" in the disciplinary rule refers to doing something that a lawyer should not do, or failing to do something that a lawyer should do. *In re Haws*, 310 Or 741, 746, 801 P2d 818 (1990). Conduct is "prejudicial" if the conduct either: (1) is repeated, causing some harm to the administration of justice or (2) involves a single act causing substantial harm to the administration of justice. *Id.* at 748. DR 1-102-(A)(4) focuses on the effect of the lawyer's conduct, not on the lawyer's intent. *In re Claussen*, 322 Or 466, 482, 909 P2d 862 (1996). The Bar charges that the accused improperly used the probate process against Smith, his former client, in an attempt to collect the attorney fees that he claimed she owed him.

In 1987, when the accused began representing Smith in her capacity as personal representative of the Estate, the Estate's assets were valued at $132,000. The only claim against the Estate at that time was the Oregon Bank's claim for $9,291.33, for which Smith was jointly liable. There was insufficient cash in the Estate to pay that claim immediately. If the Estate had been closed in 1989, the accused could not have billed the Estate for the Atkins litigation, the Atkins bankruptcy proceeding, and Smith's bankruptcy proceeding, Smith's complaint against him to the Bar, or his complaint to the Bar about Smith's bankruptcy lawyer. The accused had a personal financial interest in all those proceedings. He manipulated the probate court to try to advance his own financial interests. With the exception of advising Smith in September 1990 that his pursuit of his attorney fees had become adversarial and she should seek separate counsel, no disclosure of any actual or likely conflict of interest was made by the accused to any current or former client and no consent to any conflict was sought or obtained by him.

The accused argues that there was no conduct prejudicial to the administration of justice, because the Estate could not have been closed earlier as, he asserts, is shown by interim reports submitted to the probate court by personal representative Birnie. However, those reports only explain that there was insufficient cash available to pay the Estate's debts.[11]

The accused further argues that the Estate could not have been closed until the appeal from the Atkinses' bankruptcy had been finalized and that, by that time, Smith had improperly received an additional $27,449.14 from the Morrison settlement. Those arguments ignore the fact that the Estate should have been closed long before the Atkins trial. Had the Estate been closed, the later Atkins bankruptcy and the Morrison settlement would have been irrelevant to the Estate. Instead, what should have been a simple and short probate still was not closed as of the date of the disciplinary hearing in 1996.

The accused's attorney fee claims against Smith were the basis for his asking the probate court to order Smith to return a one-half interest in her house to the Estate that he had negotiated, no doubt in anticipation of his receipt of some of the proceeds. The Estate, which had an original estimated value of $132,000 and an estimated value of $72,619 in 1993, ended up having five personal representatives and being charged over $100,000 in attorney fees by the accused. The accused's attorney fee claims became the subject of protracted and acrimonious communications and litigation among many of the accused's clients, lawyers, and trustees, after which the probate court ruled that the accused's attorney fees would be limited to about $9,000. What should have been a straightforward fee dispute between the accused and Smith personally ended up involving both the probate court and the bankruptcy court over a period of almost ten years.[12]

---

[11] The reports do not explain why this essentially no-asset case should not have been closed earlier. As noted, Smith was liable personally on the debt to the Oregon Bank, the only claim (other than attorney fees and costs of administration) against the Estate.

[12] A reader of this opinion familiar with Charles Dickens' novel *Bleak House* might find the facts of this case reminiscent of those found in *Jarndyce and Jarndyce*, although the duration of the probate here was shorter. In *Bleak House*,

In summary, this case involves a staggering amount of unnecessary litigation and the multi-year probate of an essentially no-asset estate, which should have been closed promptly. The accused used the probate and bankruptcy courts as mere tools in his efforts to pursue his attorney fees claims against Smith.

The Bar has proved by clear and convincing evidence that the accused violated DR 1-102(A)(4) by engaging in repeated conduct that is prejudicial to the administration of justice.

■ B. DR 5-105(C) provides, in part:

"Except as permitted by DR 5-105(D), a lawyer who has represented a client in a matter shall not subsequently represent another client in the same or a significantly related matter when the interests of the current and former clients are in actual or likely conflict. Matters are significantly related if either:

"(1) Representation of the present client in the subsequent matter would, or would likely, inflict injury or damage upon the former client in connection with any proceeding, claim, controversy, transaction, investigation, charge, accusation, arrest or other particular matter in which the lawyer previously represented the former client[.]"

The Bar charges that the accused violated DR 1-105(C)(1) by representing his current clients, the personal representative and CSI, against his former client, Smith, in matters significantly related to his earlier representation of her. The Bar argues that, due primarily to the accused's machinations in pursuit of his claimed attorney fees, Smith was attacked from all sides by entities and lawyers that common sense told her (as the Estate's sole heir) should not be her adversaries.

The accused argues that he never represented Smith personally. The record, however, belies the accused's position. First, there is the 1987 retainer agreement between the

Dickens castigates the High Court of Chancery, "most pestilent of hoary sinners," which devours the estates brought to it in lawsuits that drone on for generations:

"It's being ground to bits in a slow mill; it's being roasted at a slow fire; it's being stung to death by single bees; it's being drowned by drops; it's going mad by grains."

accused and Smith identifying her alone to be the accused's client. Second, before October 1990, all of the accused's billings were sent to Smith. Third, the accused asserted in Smith's bankruptcy cases that she was his client. We conclude that the accused represented Smith personally.

The accused represented his current clients, the personal representative and CSI, against Smith. The accused represented the personal representative on a motion in the probate court, seeking to declare improper the transfer of the Estate's one-half interest in the house to Smith and to require her to return it to the Estate, notwithstanding that he himself had facilitated that transfer. The accused argued below and now continues to assert that he represented only Birnie in the 1988 house transfer and, therefore, that his subsequent attempts to force Smith to return the half-interest in the house could not constitute a former client conflict. That assertion is not supported by any facts. The accused testified at the disciplinary hearing that he considered Smith to be his client at that time and that he arranged for the transfer at Smith's request. The record reflects that the accused billed her for almost five hours of his time spent working on the property transfer.

The accused also represented the personal representative and CSI in Smith's bankruptcy proceedings, using what he earlier had learned of Smith's possible income and assets in an attempt to persuade the bankruptcy trustee to pursue those assets. The accused argues that it was not improper for him to use such information to collect the attorney fees that he claims that Smith owed him and to protect himself from her attempt to discharge her debt to him in bankruptcy.[13] However, the accused was representing not only himself in the bankruptcy case; he also was representing the Estate and CSI. Thus, he represented current clients against a former client in matters significantly related to his

_____

[13] The Bar did *not* charge the accused with a violation of DR 4-101 (knowingly revealing confidences and secrets of a client). DR 4-101(C) provides that a lawyer may reveal confidences or secrets necessary to establish a claim or defense on behalf of a lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations concerning the lawyer's representation of the client.

earlier representation of her. We reject the accused's argument that his representations in the bankruptcy proceedings were actions taken against the bankruptcy trustee rather than against Smith personally. The accused's selfish conduct in pursuit of his attorney fees injured both his former client and his current clients.

The Bar has proved by clear and convincing evidence that the accused violated DR 5-105(C) by representing his current clients, the personal representative and CSI, against his former client, Smith, in matters significantly related to his earlier representation of her.

■ C. DR 5-101(A) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1) a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

The Bar charges that the accused violated DR 5-101(A)(1) by continuing to represent the personal representative and CSI when his professional judgment was or reasonably may have been affected by his own financial interests. The evidence in the record in support of that charge is overwhelming, and need not be recited here again.

The Bar has proved by clear and convincing evidence that the accused violated DR 5-101(A)(1) by continuing his representation of the personal representative and CSI after it became apparent that the exercise of his independent professional judgment on behalf of those current clients was or reasonably may have been affected by his own financial or personal interests in pursuing his attorney fees claims against Smith.

■ D. DR 2-106(A) provides:

"A lawyer shall not enter into an agreement for, charge or collect an illegal or clearly excessive fee."

The Bar charged that the accused violated DR 2-106(A) by charging the Estate a clearly excessive fee.

According to the first inventory filed with the probate court, the initial value of the Estate was $132,000. Notwithstanding that value, the accused ultimately billed the Estate for $101,967. There was expert testimony at the disciplinary hearing that charging an Estate with assets of $132,000 more than $100,000 for professional services is a clearly excessive fee. As noted, the probate court allowed only about $9,000 of the amount that the accused claimed.

We find no evidence in the record that the personal representative or Smith, as President of CSI, retained the accused to pursue the Atkins litigation. Rather, Smith personally retained him in August 1987 for that purpose. Nonetheless, beginning in October 1990, the accused began billing the Estate and CSI for his services.

At the disciplinary hearing, there was expert testimony that the personal representative of an estate such as John Smith's would not have hired a lawyer on an hourly basis to pursue the Atkins matter, because the Estate lacked the funds necessary to pay a lawyer on that basis. This may explain why the accused made his retainer agreement with Smith personally and not with the personal representative or CSI.

The accused also billed the Estate for the time that he spent in bankruptcy court seeking to avoid the discharge of his disputed claims against Smith, as well as for the time he spent defending himself against Smith's complaints to the Bar about him and his complaints to the Bar about Smith's bankruptcy lawyer.[14]

The Bar has proved by clear and convincing evidence that the accused violated DR 2-106(A) by charging both the Estate and Smith clearly excessive fees.

■ E. Finally, we consider whether the accused violated DR 7-102(A), which provides, in part:

---

[14] DR 2-106(B) lists several factors to be considered as guides in determining the reasonableness of a fee. In a particular case, other factors also may be relevant. We believe that the probate court's order awarding the accused only about $9,000 out of a total of over $100,000 claimed supports a conclusion that the accused tried to collect a clearly excessive fee.

"In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:

"* * * * *

"(2) Knowingly advance a claim or defense that is unwarranted under existing law except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification or reversal of existing law."

The Bar charges that the accused violated DR 7-102(A)(2) by using the Estate and CSI to pursue his attorney fees from Smith.

 We find that the accused's claims in Smith's bankruptcy (purportedly on behalf of the Estate and CSI) were unwarranted for another reason: They were duplicative and were filed for the clear purpose of disqualifying Smith from Chapter 13 bankruptcy. Legal deceit involving duplicative claims violates DR 7-102(A)(2). *See In re White*, 311 Or 573, 591, 815 P2d 1257 (1991) (discussing issue).

The accused claimed that CSI was entitled to recover the $27,000 in Morrison settlement funds which, he asserts, Nepom improperly paid to Smith. Simultaneously, the accused claimed for the Estate (which owned all of CSI's stock and, therefore, owned CSI's claim against Smith) the same $27,000, plus an additional $17,000, representing half the value of the house. If the claims were valid at all, either CSI was entitled to the money or the Estate (which owned CSI) was, but, obviously, both the Estate and CSI could not collect the same $27,000 from Smith. As noted, the accused was motivated to make this duplicative claim not for any legitimate reason but, instead, to make Smith's unsecured debt look as large as possible in order to disqualify her from pursuing Chapter 13 bankruptcy.

The accused's motive for the duplicative claims is apparent at the bankruptcy proceedings. In November 1992, the accused made a motion to dismiss Smith's Chapter 13 bankruptcy proceeding. The bankruptcy court indicated that it would not consider the accused's claim (some $70,000) to be liquidated, leaving Smith's total liquidated debt to be, at most, only half the Chapter 13 limit. In December 1992, the

accused filed proofs of claim for the Estate and CSI. However, that portion of the *Morrison* settlement amount paid by Nepom to Smith and the half-interest in the house conveyed to her by Birnie, with the accused's cooperation, together totaled less than the $50,000 needed to exceed the jurisdictional limit. To solve that problem, the accused claimed the Morrison settlement amount twice. By means of those duplicative claims, the accused was able to boost the claimed liquidated debt (exclusive of the accused's claim, which the bankruptcy court already had disallowed) to over $100,000, forcing Smith to dismiss her Chapter 13 petition.

The Bar proved by clear and convincing evidence that the accused violated DR 7-102(A)(2) by knowingly advancing a claim that was unwarranted under existing law.

In summary, we conclude that the accused violated DR 1-102(A)(4), DR 5-105(C), DR 5-101(A), DR 2-106(A), *and* DR 7-102(A)(2). We turn to the issue of the appropriate sanction.

## III. SANCTION

We now turn to a determination of the appropriate sanction in this case. We do so, recognizing that the purpose of a sanction is not to penalize the accused, but to protect the public and the integrity of the profession. *In re Bristow*, 301 Or 194, 206, 721 P2d 437 (1986). In considering the appropriate sanction for the violations found, this court refers to the American Bar Association *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) and Oregon case law. *In re Wyllie*, 326 Or 447, 455, 952 P2d 550 (1997), *on recons* 326 Or 622, 956 P2d 951 (1998). The court considers four factors: the duty violated, the accused's mental state involved, the actual or potential injury sustained, and any aggravating or mitigating circumstances. ABA Standard 3.0.

### 1. *Duty violated*

In this case, the accused violated duties owed to his former and current clients to avoid conflicts of interest. ABA Standard 4.3. He also violated duties to the legal system to avoid abusing the legal process, ABA Standard 6.2, and to the profession to avoid excessive or improper fees. ABA Standard 7.0.

## 2. *Mental state*

The ABA Standards explain that an act is "intentional" if it is done with a conscious objective or purpose to accomplish a particular result. ABA Standards at 17. In this case, the accused acted intentionally with respect to all the charges.

## 3. *Injury sustained*

The purpose of the disciplinary process is to protect the public. ABA Standards at 25. Smith, an elderly widow with a limited education, was caused to suffer years of aggravation and uncertainty and to incur substantial costs for attorney fees in attempting to counter the accused's improper actions against her. The probate court's ability to manage its docket was harmed by the accused's self-interest in keeping the probate open long after it should have been closed in order to pursue his attorney fees claims against Smith.

At this point, and without consideration of aggravating or mitigating factors, the ABA Standards provide:

"4.31 Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):

"(a) engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client; or

"(b) simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client; or

"(c) represents a client in a matter substantially related to a matter in which the interest of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.

"4.32 Suspension is generally appropriate when a lawyer knows of the conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client.

"* * * * *

"7.2 Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system."

That is, before considering any aggravating and mitigating factors, the ABA Standards suggest that either suspension or disbarment would be an appropriate sanction in this case.

### 4. *Aggravating and mitigating circumstances*

Aggravating factors present are: a prior disciplinary offense (the accused was admonished in 1985);[15] a dishonest or selfish motive; a pattern of misconduct; multiple offenses; refusal to acknowledge the wrongful nature of his conduct (the accused insists that he committed no ethical violation); a vulnerable victim; substantial experience in the practice of law (the accused was admitted to practice in 1983); and indifference to making restitution. ABA Standards 9.22(a) to (d), (g) to (j). The only mitigating factor in this case is that the accused cooperated with the disciplinary process. ABA Standard 9.32(e). In sum, the aggravating factors greatly outweigh the mitigating ones.

The remaining consideration is this court's case law. We have found no Oregon case directly on point. However, some cases are instructive.

In *Claussen*, the accused lawyer engaged in a current client conflict of interest in his representation of bankruptcy clients. He also engaged in conduct prejudicial to the administration of justice by making misrepresentations to the bankruptcy court and by manipulating the bankruptcy process to further the ends of his clients. The lawyer was suspended for one year. However, this case involves a more prolonged abuse of the probate and bankruptcy courts, for the self-interest of the accused. Here, the accused also charged a clearly excessive fee.

---

[15] The record does not disclose the nature of the accused's 1985 misconduct.

In *In re Altstatt*, 321 Or 324, 897 P2d 1164 (1995), the accused lawyer represented the personal representatives of an estate to which he owed a significant amount of money. The court found that the lawyer's self-interest affected his professional judgment on behalf of his clients in violation of DR 5-101(A). During his representation, the lawyer claimed and obtained attorney fees without court approval, which constituted a collection of an illegal fee and conduct prejudicial to the administration of justice. Aggravating factors included a selfish motive, indifference to making restitution, and substantial experience in estate practice. The lawyer was suspended for one year.

In *White*, the accused lawyer intentionally and repeatedly violated his duty to the legal system during the course of litigation. He abused the legal system by filing a multitude of vexatious actions on behalf of his client. He intentionally used the legal system as a tool to harass, rather than to resolve his client's legitimate disputes. He knowingly made a false statement to the trial court. His conduct wasted a great deal of time and money for the courts, lawyers, and litigants involved. The lawyer was suspended for three years.

In *In re Miller*, 310 Or 731, 801 P2d 814 (1990), the accused lawyer kept an estate open for six years. On several occasions when the probate court inquired, the lawyer misrepresented the status of the case. In the final accounting, the lawyer requested attorney fees of $5,962, which the court found to be excessive when measured against the $12,500 value of the estate. The lawyer also was held to have violated DR 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR 1-102(A)(4) (engaging in conduct that is prejudicial to the administration of justice), DR 2-106(A) (charging an illegal or clearly excessive fee), and DR 6-101(B) (neglect of a legal matter) for failing to close the estate promptly. This court held that such conduct ordinarily would justify a long suspension. However, because the lawyer had been found guilty of serious misconduct in two earlier disciplinary cases, he was disbarred.

In this case, we agree with the trial panel's characterization of the accused's conduct:

.

"[The accused] engaged in multiple conflicts of interest, attempted to use his representation of current clients to obtain payment from Mrs. Smith, and charged excessive fees to the Estate. His conduct focused upon using the means available to him to force Mrs. Smith to compensate him. In his efforts to seek payment from a client that he believed treated him improperly he was blind to the restraints of the Disciplinary Rules."

While case-matching is an inexact science, we think that it is fair to say that the enormity and duration of the accused's overreaching in the case, the accused's blatant misrepresentations to the probate and bankruptcy courts, and the numerous aggravating factors make this set of violations of the Disciplinary Rules more serious than those found in either *Claussen* or *Altstatt*. This case is more like *White* and *Miller*, but without the history of other serious misconduct that led to disbarment in *Miller*. On balance, we find that a two-year suspension is warranted in this case.

The accused is suspended from the practice of law for a period of two-years commencing on the effective date of this decision.